No. 26-5182

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

GANNETT COMPANY, INC.; GRAY LOCAL MEDIA, INC.;
NASHVILLE PUBLIC MEDIA, INC, *dba* NASHVILLE BANNER
PUBLISHING COMPANY; NEXSTAR MEDIA GROUP, INC.,
SCRIPPS MEDIA, INC.; STATES NEWSROOM *dba* TENNESSEE
LOOKOUT; TEGNA INC.,

*Plaintiffs-Appellants,*

*v.*

JEFF LONG, *in his official capacity as Commissioner of the Tennessee Department of Safety and Homeland Security*; GLENN R. FUNK, *in his official capacity as District Attorney General for Nashville & Davidson County, Tennessee*; JOHN DRAKE, *in his official capacity as Chief of Metropolitan Nashville Police Department*,

*Defendants-Appellees.*

---

On Appeal from the United States District Court for the
Middle District of Tennessee
Case No. 3:25-cv-00830 (Hon. William L. Campbell, Jr.)

---

### BRIEF FOR PLAINTIFFS-APPELLANTS

[*Caption Continued on Inside Cover*]

Grayson Clary
  *Counsel of Record*
Paul R. McAdoo (BPR No. 034066)
REPORTERS COMMITTEE
 FOR FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, DC 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
gclary@rcfp.org
pmcadoo@rcfp.org

*Counsel for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENTS

Gannett Co., Inc. is a publicly held Delaware corporation with a principal place of business in New York and no parent corporation. During the pendency of this litigation, Gannett Co., Inc. changed its name to USA TODAY Co., Inc.  Its corporate structure and ownership are otherwise unchanged.

Gray Local Media, Inc. is a Delaware corporation with a principal place of business in Georgia.  Gray Local Media, Inc., is a wholly owned subsidiary of Gray Media, Inc., a publicly held corporation.

Nashville Public Media, Inc. *d/b/a* Nashville Banner is a 501(c)(3) nonprofit organization with no parent company and no stock.

Nexstar Media Group, Inc. is a publicly held Delaware corporation with a principal place of business in Texas and no parent corporation. Nexstar Media Group, Inc., is the parent corporation of Nexstar Media, Inc.  TEGNA, Inc., is a wholly owned subsidiary of Nexstar Media Group, Inc.  BlackRock, Inc. and The Vanguard Group, Inc. own 10% or more of the stock of Nexstar Media Group, Inc.

Scripps Media, Inc. is a Delaware corporation with a principal place of business in Ohio.  It is a wholly owned subsidiary of The E.W.

iii

Scripps Company.  Affiliated corporations of Scripps Media, Inc. include the other direct, wholly owned subsidiaries of The E.W. Scripps Company: ION Media Networks, Inc., a Florida corporation; Scribion Broadcast Holdings, Inc., a Georgia Corporation; and Scripps National Spelling Bee, Inc., an Ohio corporation.  No publicly held corporation owns 10% or more of the stock of The E.W. Scripps Company.

States Newsroom *d/b/a* Tennessee Lookout is a 501(c)(3) nonprofit organization with no parent corporation and no stock.

TEGNA, Inc., is a wholly owned subsidiary of Nexstar Media Group, Inc.  No other publicly held corporation owns 10% or more of TEGNA's stock.

## STATEMENT OF REASONS REGARDING ORAL ARGUMENT

Oral argument would likely aid the Court in addressing the significant constitutional questions that the statute challenged here raises under the Due Process Clause and the First Amendment, as other Circuits have found in reviewing similar laws.  *See Reps. Comm. for Freedom of the Press v. Rokita*, 147 F.4th 720, 731–32 (7th Cir. 2025) (relying on the State of Indiana's representations at oral argument in finding Indiana's police buffer-zone statute unconstitutionally vague); Order, *Deep S. Today v. Murrill*, No. 25-30128 (5th Cir. Apr. 16, 2026) (scheduling oral argument for June 1, 2026 in appeal of order enjoining the enforcement of Louisiana's police buffer-zone statute).

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS.........................................iii

STATEMENT OF REASONS REGARDING ORAL ARGUMENT.........v

TABLE OF AUTHORITIES ............................................................. viii

INTRODUCTION ......................................................................... 1

STATEMENT OF JURISDICTION......................................... 5

STATEMENT OF THE ISSUES ............................................. 6

STATEMENT OF THE CASE ................................................. 7

    I.    Tennessee adopts the police buffer-zone statute. ......................... 7

    II.   The statute's impact on Plaintiffs' newsgathering. ...................... 8

    III. Plaintiffs seek a preliminary injunction to prevent
        Defendants from enforcing the statute against them.................14

STANDARD OF REVIEW ..........................................................19

SUMMARY OF ARGUMENT................................................20

ARGUMENT.................................................................................23

    I.    Plaintiffs are likely to succeed on the merits. ...........................23

       A.  Plaintiffs are likely to demonstrate standing to challenge
           Tennessee's police buffer-zone statute. ...................................24

       B.  Plaintiffs are likely to succeed in demonstrating that the
           buffer-zone law is void for vagueness on its face. ....................31

       C.  Plaintiffs are likely to succeed in demonstrating that the
           buffer-zone law violates the First Amendment........................38

          a.   The statute violates the First Amendment as applied
               to nonobstructive newsgathering.......................................38

b.  The statute violates the First Amendment on its face. ......43

II.  Plaintiffs are likely to suffer irreparable harm without a
preliminary injunction against the statute's enforcement. .........47

III.  The remaining equitable factors favor preliminary relief. ..........51

CONCLUSION...................................................................................53

CERTIFICATE OF COMPLIANCE .....................................................55

CERTIFICATE OF SERVICE ............................................................56

# TABLE OF AUTHORITIES

## Cases

*Agnew v. District of Columbia*,
   920 F.3d 49 (D.C. Cir. 2019)............................................................36

*Am. C.L. Union Fund of Mich. v. Livingston Cnty.*,
   796 F.3d 636 (6th Cir. 2015)...........................................................53

*Am. C.L. Union of Ill. v. Alvarez*,
   679 F.3d 583 (7th Cir. 2012).....................................................41, 43

*Bell v. Keating*,
   697 F.3d 445 (7th Cir. 2012)...............................................32, 36, 44

*Bonnell v. Lorenzo*,
   241 F.3d 800 (6th Cir. 2001).....................................................*passim*

*Brown v. Kemp*,
   86 F.4th 745 (7th Cir. 2023)..........................................26, 40, 43, 44

*Cath. Charities v. Whitmer*,
   162 F.4th 686 (6th Cir. 2025) ....................................................23, 52

*CBS Inc. v. Young*,
   522 F.2d 234 (6th Cir. 1975)......................................................25, 39

*Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*,
   511 F.3d 535 (6th Cir. 2007)......................................................19, 52

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*,
   162 F.4th 631 (6th Cir. 2025) .........................................................52

*City of Chicago v. Morales*,
   527 U.S. 41 (1999) .....................................................................*passim*

*City of Lakewood v. Plain Dealer Publ'g Co.*,
   486 U.S. 750 (1988) ..................................................................*passim*

*Connection Distrib. Co. v. Reno*,
  154 F.3d 281 (6th Cir. 1998)............................................ 19, 21, 23, 48

*D.T. v. Sumner Cnty. Schs.*,
  942 F.3d 324 (6th Cir. 2019)................................................. 17, 48, 49

*Deep S. Today v. Murrill*,
  779 F. Supp. 3d 782 (M.D. La. 2025),
  *appeal docketed*, No. 25-30128 (5th Cir. Mar. 7, 2025) ............... *passim*

*Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*,
  158 F.4th 732 (6th Cir. 2025) ...........................................................49

*Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville
  & Davidson Cnty.*,
  274 F.3d 377 (6th Cir. 2001)..............................................................53

*Detroit Free Press v. Ashcroft*,
  303 F.3d 681 (6th Cir. 2002)..............................................................50

*Dutton v. Shaffer*,
  No. 23-5850, 2024 WL 3831884
  (6th Cir. Aug. 15, 2024) .................................................. 21, 23, 47, 48

*Feliciano v. Dep't of Transp.*,
  605 U.S. 38 (2025) ............................................................................34

*Fischer v. Thomas*,
  52 F.4th 303 (6th Cir. 2022).............................................................25

*Fowler v. Benson*,
  924 F.3d 247 (6th Cir. 2019)..............................................................19

*Glik v. Cunniffe*,
  655 F.3d 78 (1st Cir. 2011) ...............................................................41

*Hils v. Davis*,
  52 F.4th 997 (6th Cir. 2022)................................................... 25, 26, 39

*Holder v. Humanitarian L. Project*,
  561 U.S. 1 (2010) ..............................................................................39

*Howard v. Smith Cnty.*,
No. 2:10-0009, 2011 WL 4361486
(M.D. Tenn. Sept. 19, 2011)......................................................35, 42

*Jones v. Caruso*,
569 F.3d 258 (6th Cir. 2009)............................................................48

*Jordan v. Jenkins*,
73 F.4th 1162 (10th Cir. 2023) .........................................................40

*Kareem v. Cuyahoga Cnty. Bd. of Elections*,
95 F.4th 1019 (6th Cir. 2024) ...........................................22, 25, 29, 30

*Kiser v. Reitz*,
765 F.3d 601 (6th Cir. 2014)............................................................25

*Kolender v. Lawson*,
461 U.S. 352 (1983) .......................................................................32

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) .........................................................................3

*McCullen v. Coakley*,
573 U.S. 464 (2014) ............................................................42, 44, 45

*McKay v. Federspiel*,
823 F.3d 862 (6th Cir. 2016)......................................................26, 27

*Mills v. Alabama*,
384 U.S. 214 (1966) .......................................................................53

*Nicodemus v. City of South Bend*,
137 F.4th 654 (7th Cir. 2025) ...................................................*passim*

*Obama for Am. v. Husted*,
697 F.3d 423 (6th Cir. 2012)............................................................47

*Patton v. Fitzhugh*,
131 F.4th 383 (6th Cir. 2025) ..........................................................26

*Pouillon v. City of Owosso*,
206 F.3d 711 (6th Cir. 2000)......................................................26, 40

*Reps. Comm. for Freedom of the Press v. Rokita,*
  147 F.4th 720 (7th Cir. 2025) ........................................................*passim*

*Reps. Comm. for Freedom of the Press v. Rokita,*
  751 F. Supp. 3d 931 (S.D. Ind. 2024) ................................................27

*Russell v. Lundergan-Grimes,*
  784 F.3d 1037 (6th Cir. 2015)............................................................25

*Schenck v. Pro-Choice Network of W. N.Y.,*
  519 U.S. 357 (1997) ................................................................ 43, 45, 46

*Shuttlesworth v. City of Birmingham,*
  382 U.S. 87 (1965) .........................................................................*passim*

*Sisters for Life, Inc. v. Louisville-Jefferson Cnty.,*
  56 F.4th 400 (6th Cir. 2022).........................................................*passim*

*Steffel v. Thompson,*
  415 U.S. 452 (1974) ....................................................................22, 50

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) .............................................................................4

*Thornhill v. Alabama,*
  310 U.S. 88 (1940) ............................................................................28

*Vitolo v. Guzman,*
  999 F.3d 353 (6th Cir. 2021).................................................21, 47, 48

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ..............................................................................51

*Yoder v. Bowen,*
  146 F.4th 516 (6th Cir. 2025) ......................................................28, 30

**Statutes**

28 U.S.C. § 1292...................................................................................5

28 U.S.C. § 1331...................................................................................5

xi

28 U.S.C. § 1343.................................................................................5

Tenn. Code Ann. § 39-16-602................................................................2

Tenn. Code Ann. § 39-16-612.......................................................*passim*

Tenn. Code Ann. § 39-17-305................................................ 2, 35, 42, 53

Tenn. Code Ann. § 40-35-111................................................................8

Tenn. Code Ann. § 55-8-104...........................................................35, 53

**Other Authorities**

Adam Friedman, *From Grief to Action in Nashville, Protesters
    Demand Change at the State Capitol,*
    Tenn. Lookout (Mar. 30, 2023),
    https://perma.cc/9TBL-AWSS.........................................................10

M.D. Tenn. Loc. R. 7.03 ....................................................................15

*Nashville Protesters, Police Clash After 'I Will Breathe' Rally*,
    Tennessean (May 30, 2020),
    https://bit.ly/4iViLAl...................................................................9

Order,
    *Deep S. Today v. Murrill,*
    No. 25-30128 (5th Cir. Apr. 16, 2026) ............................................ iii

## INTRODUCTION

More than fifty years ago, the Supreme Court made clear that a law that "says that a person may stand on a public sidewalk . . . only at the whim of any police officer" would be so flagrantly unconstitutional as to "need[] no demonstration." *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90 (1965). Tennessee has enacted that law. Under the State's 'police buffer-zone' statute, *see* Tenn. Code Ann. § 39-16-612(a), law enforcement officers enjoy standardless discretion to prevent the public and the press from approaching near enough to document the way that officers perform some of their most important public duties.

The law provides that an officer may (or may not) order anyone who approaches within 25 feet "to stop approaching or to retreat," on pain of arrest, whenever an officer is "lawfully engaged in the execution of official duties involving: (1) [a] lawful traffic stop; (2) [a]n active investigation of the scene of an alleged crime; or (3) [a]n ongoing and immediate threat to public safety." *Id.* Those scenarios are broad enough to sweep in most of what officers do in public. They describe, too, virtually all of the situations in which Plaintiffs—news outlets whose reporters approach within 25 feet of officers every week—

1

encounter police.  But unlike background Tennessee law, the statute does not require that an individual's presence impact an officer's duties, *see* Tenn. Code Ann. § 39-16-602 (prohibiting obstruction); that their presence be "dangerous," *id.* § 39-17-305 (prohibiting failure to comply with dispersal order); or that any interest of any kind be at stake, *see Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 405–06 (6th Cir. 2022) (buffer zone unconstitutional where "no-obstruction law" already addresses state interests).  Instead, an officer can "invoke the buffer law just because he had a bad breakfast."  *Reps. Comm. for Freedom of the Press v. Rokita,* 147 F.4th 720, 731 (7th Cir. 2025).

Other federal courts have consistently held that statutes like Tennessee's delegate unconstitutional discretion to law enforcement. *Id.* (finding Indiana's police buffer law void for vagueness on its face); *Deep S. Today v. Murrill,* 779 F. Supp. 3d 782, 824 (M.D. La. 2025), *appeal docketed*, No. 25-30128 (5th Cir. Mar. 7, 2025) (finding Louisiana's police buffer law void for vagueness on its face).  And other federal courts have consistently held that news organizations, including many of the same Plaintiffs here, can obtain relief against a buffer law's enforcement before an order puts their reporters to an unconstitutional

2

choice between "self-censorship" and the risk of arrest.  *Reps. Comm.*, 147 F.4th at 728; *Deep S. Today*, 779 F. Supp. 3d at 804–08.

Here, by contrast, the District Court held—in an oral order with little accompanying explanation—that Plaintiffs would not be able to demonstrate irreparable injury until one of their journalists had already been "arrested because they didn't honor the order of the officer," and the Court denied Plaintiffs' motion for a preliminary injunction on that theory.  Hr'g Tr. at 64:5–6, R.44, PageID#413.  It did so without any consideration of Plaintiffs' likelihood of success on the merits, despite this Circuit's precedent establishing that that factor "should be addressed first" in constitutional cases because the fact "that a constitutional right is being threatened or impaired" is, itself, irreparable harm.  *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001).

The District Court erred.  "[W]hen a deprivation of First Amendment rights is at stake, a plaintiff need not wait for the damage to occur before filing suit," *Mahmoud v. Taylor*, 606 U.S. 522, 559–60 (2025), and the point of a pre-enforcement challenge is to avoid forcing a plaintiff to "expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his

3

constitutional rights," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted). But the District Court's order has put Plaintiffs to just that dilemma. As Plaintiffs' reporters told the District Court, "[it] is very routine to get asked to step behind crime tape or to move to a staging area once law enforcement gets set up" at the scene of breaking news. Cordan Decl. ¶ 7, R.19-2, PageID#104; *see also* Partipilo Decl. ¶ 6, R.28, PageID#269 (when covering Tennessee Highway Patrol, "[i]t's common to be asked to move out of the way"). In each such interaction—the bread-and-butter of covering policing before the buffer law passed—the statute now criminalizes non-compliance. And in each such interaction, absent preliminary relief, only "unbridled discretion in a government official over whether to permit or deny expressive activity" stands between Plaintiffs and loss of their rights. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755 (1988).

Whether viewed through the lens of the Due Process Clause or the First Amendment, that arbitrary discretion violates the Constitution— as the Seventh Circuit recently found on largely identical facts. *Reps. Comm.*, 147 F.4th at 731. For the reasons given here, this Court should reverse and remand with instructions to enter a preliminary injunction.

4

## STATEMENT OF JURISDICTION

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Plaintiffs allege violations of the First and Fourteenth Amendments.  This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) because Plaintiffs appeal an order denying injunctive relief.

## STATEMENT OF THE ISSUES

1.    Whether Plaintiffs are likely to succeed on the merits in showing that Tennessee's police buffer-zone law, Tenn. Code Ann. § 39-16-612(a), violates the Due Process Clause or the First Amendment.

2.    Whether Plaintiffs—news organizations whose reporters approach within 25 feet of officers on a routine basis—demonstrated that they are likely to suffer irreparable harm from the buffer-zone law.

3.    Whether the remaining preliminary-injunction factors favor granting Plaintiffs relief from the threat of the statute's enforcement.

## STATEMENT OF THE CASE

### I.    Tennessee adopts the police buffer-zone statute.

On May 9, 2025, Tennessee Governor Bill Lee signed Public Chapter 409, 114th Gen. Assemb., Reg. Sess. (Tenn. 2025), into law. Ch. 409, R.20-1, PageID#159–162.  Section 5 of that law makes it a criminal offense to "intentionally approach[], within twenty-five feet (25'), a law enforcement officer after the officer has ordered the person to stop approaching or to retreat and the officer is lawfully engaged in the execution of official duties" in common settings where the public encounters police.  *Id.* PageID#161.  The statute went into effect on July 1, 2025.  *Id.*  Section 5 is codified at Tenn. Code Ann. § 39-16-612.

In particular, the law applies whenever "the officer is lawfully engaged in the execution of official duties involving: (1) A lawful traffic stop; (2) An active investigation of the scene of an alleged crime; or (3) An ongoing and immediate threat to public safety."  Tenn. Code Ann. § 39-16-612(a).  The statute's only affirmative defense puts the burden on the defendant to show that "the lawful order was not received or understood by the person and was not capable of being received or understood under the conditions and circumstances that existed at the

7

time of the issuance of the order." *Id.* § 39-16-612(b). Otherwise, a violation of the statute is a Class B misdemeanor—which, in Tennessee, carries penalties up to six months imprisonment or a fine of up to five hundred dollars. *Id.* § 39-16-612(c); Tenn. Code Ann. § 40-35-111(e)(2).

## II. The statute's impact on Plaintiffs' newsgathering.

Plaintiffs are organizations that gather and report news in Tennessee. Gannett Co., Inc. ("Gannett"), Gray Local Media, Inc. ("Gray"), Nexstar Media Group, Inc. ("Nexstar"), Scripps Media, Inc. ("Scripps"), TEGNA Inc. ("TEGNA"), Nashville Public Media, Inc. *d/b/a* Nashville Banner (the "Banner"), and States Newsroom *d/b/a* Tennessee Lookout (the "Lookout") are all in the business of regularly gathering and publishing newsworthy information, and all employ professional journalists assigned to cover the activities of Tennessee law enforcement. Compl. ¶¶ 18–24, R.1, PageID#4–7. As a result, a range of events bring Plaintiffs' reporters "within 25 feet of law enforcement officers at least five of the seven days of the week, covering anything from the state legislature to local government happenings to crime or accident scenes to protests and large-scale events where Tennessee Highway Patrol ("THP") and Metropolitan Nashville Police Department

8

("MNPD") officers will be present."  Rose Decl. ¶ 5, R.19-6, PageID#124.

For instance, Plaintiffs' journalists regularly approach within 25 feet of law enforcement when covering protest activity or civil disturbances, which often become "the scene of an alleged crime," or an "ongoing and immediate threat to public safety" such that the buffer-zone statute would apply.  Tenn. Code Ann. § 39-16-612(a).  Plaintiffs reported extensively on protest activity throughout Tennessee in the wake of the death of George Floyd, for instance, *see* Compl. ¶¶ 31–36, R.1, PageID#8–10 (collecting coverage), bringing them into close contact with MNPD to cover arrests of protestors, as well as MNPD's use of crowd-control techniques such as teargas and pepper spray, *see, e.g., id.* ¶ 34, PageID#9 (citing *Nashville Protesters, Police Clash After 'I Will Breathe' Rally*, Tennessean (May 30, 2020), https://bit.ly/4iViLAl). More recently, Plaintiffs covered "No Kings" rallies and protests of Kilmar Abrego Garcia's detention, both of which saw arrests.  *See* Partipilo Decl. ¶¶ 8–9, R.28, PageID#270 (noting counter-protestor with a firearm "was arrested by MNPD" at No Kings rally in June 2025 and was photographed by a Lookout reporter, and that a counter-protestor was likewise "escort[ed] . . . out of the crowd" by MNPD officers at

9

Abrego Garcia protest); Taylor Decl. ¶ 14, R.19-7, PageID#131.

Plaintiffs' reporters also routinely come into close contact with THP officers while covering newsworthy events on state property. Plaintiffs' reporters might come into contact with THP "at least a half a dozen times a week" while the Tennessee General Assembly is in session, Taylor Decl. ¶ 5, R.19-7, PageID#129, because THP officers are stationed at the State Capitol Building "every day," Partipilo Decl. ¶ 4, R.28, PageID#269. Plaintiffs' reporters cover THP's interaction with members of the public during disturbances in the gallery of the legislative chamber around "once or twice a month." *Id.* ¶ 5, PageID#269. And Plaintiffs' reporters also cover protest activity at the Capitol, which occurs "around once a month," Taylor Decl. ¶ 10, R.19-7, PageID#130, and frequently brings reporters into close proximity with THP officers making arrests. *See* Compl. ¶ 39, R.1, PageID#11 (citing Adam Friedman, *From Grief to Action in Nashville, Protesters Demand Change at the State Capitol*, Tenn. Lookout (Mar. 30, 2023), https://perma.cc/9TBL-AWSS (showing THP officers holding protestor)).

Plaintiffs' reporters also cover the activities of THP in collaboration with federal agents on state highways, where the buffer

10

law applies because officers are engaged in "traffic stop[s]."  Tenn. Code Ann. § 39-16-612(a).  For instance, last May, Nashville Banner reporters Sarah Grace Taylor and Stephen Elliott each covered a THP "operation to coordinate with U.S. Immigration and Customs Enforcement in an effort to detain undocumented immigrants along state roads in Nashville."  Elliott Decl. ¶ 12, R.19-4, PageID#115; Taylor Decl. ¶ 12, R.19-7, PageID#130–131.  And in October, Plaintiff Tennessee Lookout covered the activities of the Memphis Safe Task Force, Lookout Art., R.29-7, PageID#305–310, including by publishing an article describing how an observer had been told "to stand 25 feet away" by a federal officer while approaching "a gas station in Memphis to record over half a dozen men in bulletproof vests gathered around the flashing blue lights of a Tennessee Highway Patrol car," based on a source's first-hand video evidence of the interactions.  *Id.* PageID#306.

In the course of covering those diverse scenarios and more, before the buffer-zone statute became effective, it was "very routine to get asked to step behind crime tape or to move to a staging area once law enforcement gets set up" at the scene of breaking news.  Cordan Decl. ¶ 7, R.19-2, PageID#104; *see also* Partipilo Decl. ¶ 6, R.28, PageID#269

11

(when covering Tennessee Highway Patrol, "[i]t's common to be asked to move out of the way"). While Plaintiffs' journalists "know not to cross the line into obstruction when covering the activities of police," Cordan Decl. ¶ 10, R.19-2, PageID#105, doing their own jobs frequently requires them to "get as close to the scene as [they] can," *id.* ¶ 6, PageID#104. Accordingly, Plaintiffs' reporters approach as close to a newsworthy event as they can so that they can hear and see what is going on, *see* Elliott Decl. ¶ 10, R.19-4, PageID#114 (noting it "would have been difficult to hear" officer's interactions with members of the public while clearing homeless encampment from greater than 25 feet away), and so that they can record audio or conduct interviews, *see* Dare Decl. ¶ 8, R.19-3, PageID#109 (even with professional recording equipment, "an interview from 25 feet away just would not be possible"). Before the buffer-zone statute passed, when asked to move by an officer, Plaintiffs' reporters had a range of options: They might comply "by backing up by 3–6 feet," Taylor Decl. ¶ 16, R.19-7, PageID#132, or might "go elsewhere and look for places that have not been blocked off to get the shot," Dare Decl. ¶ 9, R.19-3, PageID#109. They might "wait until [they were] physically pushed back," Partipilo

12

Decl. ¶ 6, R.28, PageID#269, or might refuse entirely and "explain to police officers that they don't have any right to tell [them] where [they] can and cannot be as long as [they are] not breaking any laws and [] not interfering with them doing their jobs," *id.* ¶ 13, PageID#271.

With the passage of the statute, however, Plaintiffs' reporters could "be arrested if [they] do not back up far enough." Taylor Decl. ¶ 16, R.19-7, PageID#132. As a result, some of Plaintiffs' reporters plan to comply with orders to retreat because "at the end of the day, there is no story worth going to jail for." Cordan Decl. ¶ 11, R.19-2, PageID#105. Others "would rather risk arrest than comply" if an order to retreat "wasn't justified and would stop [them] from documenting a newsworthy event." Partipilo Decl. ¶ 11, R.28, PageID#271; *see also* Elliott Decl. ¶ 15, R.19-4, PageID#116 (same). And some would have no choice one way or the other, either because they cannot reliably estimate 25 feet in the field, *see* Taylor Decl. ¶ 16, R.19-7, PageID#132; Partipilo Decl. ¶ 12, R.28, PageID#271, or because they frequently encounter officers in settings—like a crowded demonstration or packed public spaces at the capitol—where retreating to a distance of 25 feet is impossible, *see* Elliott Decl. ¶ 14, R.19-4, PageID#115–116; Taylor Decl.

13

¶ 8, R.19-7, PageID#129; Partipilo Decl. ¶ 12, R.28, PageID#271.

### III.    Plaintiffs seek a preliminary injunction to prevent Defendants from enforcing the statute against them.

On July 22, 2025, Plaintiffs filed suit against Defendants Jeff Long, Commissioner of the Tennessee Department of Safety and Homeland Security; Glenn Funk, District Attorney General for Nashville and Davidson County; and John Drake, Chief of Metropolitan Nashville Police Department.  Compl., R.1, PageID#1–21.  Plaintiffs alleged that the buffer-zone statute was void for vagueness under the Due Process Clause and that it violated the First Amendment, both on its face and as applied to Plaintiffs' peaceful, nonobstructive newsgathering in public.  *Id.* ¶¶ 63–88, PageID#15–20.  On August 22, 2025, Plaintiffs moved for a preliminary injunction restraining Defendants from enforcing the Act against them.  Pls.' Mot., R.19, PageID#67–69; *see also* Pls.' Mem. of Law in Supp., R.19-1, PageID#70– 101.  Plaintiffs' complaint and motion for preliminary injunction described the detrimental effects that the buffer-zone statute would have on their newsgathering, supported by the declarations of six of

14

Plaintiffs' reporters.  R.19-2–R.19-7, PageID#102–132.[1]  Commissioner Long and General Funk opposed Plaintiffs' motion.  Defs. Long & Funk's Resp. in Opp'n, R.20, PageID#135–158.  Chief Drake took no position on the merits of Plaintiffs' constitutional challenge or request for an injunction.  Def. Drake's Resp., R.21, PageID#241–242.

The hearing on Plaintiffs' motion was initially scheduled for October 30, 2025.  Order, R.26, PageID#265.  On October 23, 2025, the parties filed their respective exhibit lists in anticipation of the hearing.  Plaintiffs designated the previous declarations of their reporters, as well as an article that had been published by Tennessee Lookout in October that described the use of the buffer-zone statute by federal officers in Memphis against an observer in the presence of THP, accompanied by first-hand source videos provided to the Lookout.  Pls.' Ex. List, R.29, PageID#273; Lookout Art., R.29-7, PageID#305–310.

In response, Defendants Long and Funk filed a Declaration by

---

[1]    The Declaration of John Partipilo submitted with Plaintiffs' Motion for Preliminary Injunction was originally executed electronically.  R.19-5, PageID#117–121.  In compliance with M.D. Tenn. Local Rule 7.03(e)(4), an identical version of that Declaration was re-executed with an original signature in September 2025 and subsequently substituted by Plaintiffs.  R.28, PageID#268–271.  Citations in this brief are to Partipilo's re-executed declaration.

15

Colonel Matt Perry of the THP, representing that THP had "no documentation regarding the incident referenced in the article" and that THP had "issued no citations pursuant to 2025 Tenn. Pub. Acts, ch. 409," Perry Decl. ¶¶ 4–5, R.30-1, PageID#315.  The declaration did not specify whether THP would refrain from enforcing the statute (against Plaintiffs or anyone else) and did not specify whether THP officers have issued orders to stop approaching or to retreat since the passage of the statute.  *See id.*  Deputy Chief Chris Gilder of the Metropolitan Nashville Police Department ("MNPD") also filed a declaration in anticipation of the October hearing, stating that "MNPD has not charged any individual with violating Tenn. Code Ann. § 39-16-612(a)" and stating that MNPD had instructed its officers to "refrain from enforcing the statute while this litigation is pending."  Gilder Decl. ¶¶ 4–5, R.33-1, PageID#321–322.  Like the Perry declaration, the Gilder declaration did not specify whether MNPD officers continue to issue orders to stop approaching or to retreat since the passage of the statute (as distinct from making arrests or issuing citations under the law).  *See id.*  Defendant Funk submitted no representations of any kind about his past enforcement of the statute or his intentions for future enforcement.

16

The hearing on Plaintiffs' motion was then continued several times, first on the District Court's initiative, *see* Order, R.34, PageID#323 (continuing hearing from October 30); Minute Order (Dec. 11, 2025) (continuing hearing from December 18), then in response to inclement weather, Order, R.38, PageID#328 (continuing hearing from January 28), and was not ultimately held until February 17, 2026.

At the hearing, the District Court denied Plaintiffs' motion from the bench on the grounds that they had failed to show irreparable harm.  Hr'g Tr. at 63:9–14, R.44, PageID#412.  In declining to reach the remaining preliminary-injunction factors, the District Court relied on *D.T. v. Sumner County Schools*, 942 F.3d 324 (6th Cir. 2019), a decision that neither party had raised in the briefing or argument, saying that "a District Court is well within its province to deny an injunction based solely on the lack of a showing of immediate and irreparable harm." Hr'g Tr. at 62:12–22, R.44, PageID#411.  Relying in part on Chief Drake's position that MNPD "[did] not intend to enforce" the law and asserting that "the law went into effect seven months ago, and I'm not aware of any particular situation where it has impacted a reporter or anyone" as of the date of the preliminary-injunction hearing, the

17

District Court found that Plaintiffs had not shown irreparable harm. *Id.* at 63:2–9, PageID#412. The court further directed Plaintiffs to supplement the record if one of their "reporters is arrested because they didn't honor the order of the officer," because "it could go to the issue of irreparable harm." *Id.* at 64:2–9, PageID#413. Following the end of the hearing, the District Court issued a brief written order, denying the motion for preliminary injunction "for the reasons stated on the record" at the hearing. Order, R.40, PageID#331. On March 5, Plaintiffs timely filed a notice of appeal. Notice of Appeal, R.46, PageID#417.

18

## STANDARD OF REVIEW

This Court "review[s] for abuse of discretion the district court's decision to grant [or deny] a preliminary injunction, but we review de novo conclusions of law . . . that undergird the district court's decision." *Fowler v. Benson*, 924 F.3d 247, 256 (6th Cir. 2019).

The preliminary-injunction decision, for its part, considers "(1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff could suffer irreparable harm without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). Because "a finding of irreparable injury is mandated" where "a constitutional right is being threatened or impaired," a plaintiff's likelihood of success "should be addressed first" in constitutional cases. *Bonnell*, 241 F.3d at 809.

Where a district court erroneously failed to reach one or more of the factors, "in order not to unduly prolong the resolution of the parties' underlying dispute," this Court can "evaluate[] all the preliminary injunction factors" for itself. *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007).

19

## SUMMARY OF ARGUMENT

Whether the lens is the Fourteenth Amendment or the First, the statute challenged here violates the Constitution for much the same reason: Under its plain text, an officer can order a person to retreat for any reason or for no reason, including "because he had a bad breakfast." *Reps. Comm.*, 147 F.4th at 731.  The result is a statute that permits officers "to decide arbitrarily which members of the public they will order to disperse," a law "indistinguishable" in that respect "from the law [the Supreme Court] held invalid in *Shuttlesworth v. Birmingham*, [382 U.S. 87 (1965)]," *City of Chicago v. Morales*, 527 U.S. 41, 58–59 (1999) (plurality opinion), and one that carries an "ever-present potential for arbitrarily suppressing First Amendment liberties," *Shuttlesworth*, 382 U.S. at 91.  Just months ago, on just those grounds, the Seventh Circuit found that a similar Indiana statute was void for vagueness on its face on a materially identical record in a suit brought by most of the same Plaintiffs here.  *Reps. Comm.*, 147 F.4th at 731.

The District Court reached a different result only by failing to apply the standard that governs preliminary injunctions where a constitutional right is threatened.  This Court has explained again and

20

again that "the questions of harm to the parties and the public interest generally cannot be addressed properly in the First Amendment context without first determining if there is a constitutional violation," *Connection Distrib. Co.*, 154 F.3d at 288, and that a district court therefore "err[s]" if it "considers[] the second preliminary injunction factor—whether Plaintiffs would suffer an irreparable injury without the injunction—first, claiming that this factor was dispositive," *Bonnell*, 241 F.3d at 809; *see also, e.g.*, *Dutton v. Shaffer*, No. 23-5850, 2024 WL 3831884, at *4 (6th Cir. Aug. 15, 2024) (district court "should have assessed [plaintiff's] likelihood of success on the merits before reaching the irreparable injury question"). And for good reason. The two questions are nearly always inseparable when constitutional rights are at stake, because "if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Vitolo v. Guzman*, 999 F.3d 353, 365 (6th Cir. 2021) (citation omitted).

In requiring that Plaintiffs instead show that their reporters had already been "arrested because they didn't honor the order of the officer," Hr'g Tr. at 64:5–6, R.44, PageID#413, the District Court inverted the core logic of the governing rule. The credible threat that

21

an unconstitutional statute will be enforced in the future "deters the exercise of [a plaintiff's] constitutional rights" here and now, *Steffel v. Thompson*, 415 U.S. 452, 459 (1974), and the "self-censorship" that results is "a harm that can be realized even without an actual prosecution," *Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019, 1023 (6th Cir. 2024) (citation omitted).  Because Plaintiffs are likely to succeed in showing that the buffer-zone statute is unconstitutional, and because Plaintiffs are likely to receive orders under the statute before final judgment in this case, that familiar principle should have controlled here.  *See Reps. Comm.*, 147 F.4th at 728 (reporters' affidavits "explaining that they conduct newsgathering activities in proximity to police officers every day" demonstrated credible threat of enforcement and "self-censorship" under police buffer-zone law).

At bottom, with the buffer law, Tennessee has attached new penalties to First Amendment activity that Plaintiffs' journalists undertake every day.  Officers now enjoy arbitrary discretion to choose which of the countless individuals who pass within 25 feet in covered scenarios should be ordered to retreat; the text has nothing to say about that question, no "guidance to the officer deciding whether such an

22

order should issue," *Reps. Comm.* 147 F.4th at 731 (quoting *Morales*, 527 U.S. at 62 (majority opinion)), and no nexus to obstruction, safety, or any other legitimate interest. To redress the chilling effect that standardless discretion already inflicts, the District Court should have granted interim relief. And because there is "no reason to allow this near-certain violation of the plaintiffs' First Amendment rights to continue throughout the pendency of this case," this Court should reverse and "remand for prompt entry of a preliminary injunction." *Cath. Charities v. Whitmer*, 162 F.4th 686, 696 (6th Cir. 2025).

## ARGUMENT

### I.    Plaintiffs are likely to succeed on the merits.

The analysis in this case starts where this Court has required district courts to start when constitutional rights are threatened: with the "logically antecedent" question of likelihood of success. *Dutton*, 2024 WL 3831884, at *2; *see Bonnell*, 241 F.3d at 809 (same); *Connection Distrib. Co.*, 154 F.3d at 288 (same). On that front, Plaintiffs are likely to succeed in demonstrating that the statute is void for vagueness because officers enjoy arbitrary discretion to order any person to retreat for "any reason"—"[a] good reason, a bad reason," or "a

23

reason the officer just makes up." *Reps. Comm.*, 147 F.4th at 731.  And

that same "unbridled discretion in a government official over whether to

permit or deny expressive activity" violates the First Amendment, *City

of Lakewood*, 486 U.S. at 755, whether the statute is reviewed on its

face or as applied to Plaintiffs' newsgathering.  Either way, a law under

which "a person may stand on a public sidewalk . . . only at the whim of

any police officer" is unconstitutional.  *Shuttlesworth*, 382 U.S. at 90.

### A.    Plaintiffs are likely to demonstrate standing to challenge Tennessee's police buffer-zone statute.

As a threshold matter, Plaintiffs have standing to challenge the

statute's chilling sweep, as other federal courts have concluded on

essentially identical facts.  *See Reps. Comm.*, 147 F.4th at 728 (news

outlets established standing by "submitt[ing] affidavits . . . explaining

that they conduct newsgathering activities in proximity to police officers

every day"); *Deep S. Today*, 779 F. Supp. 3d at 804–08 (same).

In a pre-enforcement challenge like this one, a plaintiff satisfies

Article III's injury-in-fact requirement by demonstrating "an intention

to engage in a course of conduct arguably affected with a constitutional

interest, but proscribed by a statute, and [that] there exists a credible

threat of prosecution thereunder."  *Kiser v. Reitz*, 765 F.3d 601, 608 (6th

24

Cir. 2014) (citation omitted). "[P]ast enforcement is not necessary to establish a credible threat of enforcement," *Kareem*, 95 F.4th at 1025–26; the prospect of enforcement need only be "reasonably founded in fact," *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1049 (6th Cir. 2015) (citation omitted). And that standard is especially lenient in First Amendment cases, where the "rationale for pre-enforcement challenges applies with particular force" because "self-censorship is a harm that can be realized even without an actual prosecution." *Kareem*, 95 F.4th at 1023 (citation and internal quotation marks omitted). On that footing, in evaluating whether a credible threat exists, "the first and most important factor is whether the challenged action chills speech" in practice. *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022).

That standard is more than satisfied here. As to whether the activity regulated by the buffer law is affected with a constitutionally protected interest, this Court has made clear that the First Amendment safeguards the right to "gather news," *CBS Inc. v. Young*, 522 F.2d 234, 238 (6th Cir. 1975), including in "public settings" like those in which Plaintiffs encounter police, *Hils v. Davis*, 52 F.4th 997, 1002 (6th Cir. 2022). And because "the First Amendment protects conduct and

25

activities necessary for expression," it likewise protects "approaching" a newsworthy event "to carry out plaintiffs' protected monitoring and recording." *Brown v. Kemp*, 86 F.4th 745, 779–81 (7th Cir. 2023); *see also Nicodemus v. City of South Bend*, 137 F.4th 654, 663–64 (7th Cir. 2025) (police-buffer law regulates First Amendment activity). Police orders "requiring [a speaker] to move" therefore implicate constitutional rights. *Pouillon v. City of Owosso*, 206 F.3d 711, 717 (6th Cir. 2000).

Plaintiffs also face a credible threat that the statute will be enforced against them. For one, as to "a history of past enforcement," *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016), Plaintiffs' reporters have described that their First Amendment activity routinely drew instructions to retreat in scenarios where the buffer law now criminalizes noncompliance. *See* Partipilo Decl. ¶ 6, R.28, PageID#269; Cordan Decl. ¶ 7, R.19-2, PageID#104; Taylor Decl. ¶ 16, R.19-7, PageID#132; *see also Patton v. Fitzhugh*, 131 F.4th 383, 391 (6th Cir. 2025) (noting that "standing is determined at the time the complaint is filed" (citation and alteration omitted)). As a result, the same orders will now force Plaintiffs to choose between "self-censorship" and "flouting the buffer law," *Reps. Comm.*, 147 F.4th at 728. Video

26

evidence establishes, too, that the law has been enforced against others for similar conduct—recording officers participating in the federal/state Memphis Safe Task Force—since its adoption. Lookout Art., R.29-7, PageID#306; *see Fischer*, 52 F.4th at 308 (credible-threat inquiry looks not just to plaintiff but also to "past enforcement against others").

The statute also has an attribute that "makes enforcement easier or more likely," *McKay*, 823 F.3d at 869—namely, it vests all law enforcement officers throughout Tennessee with discretion to decide when to summon a 25-foot forcefield, for any reason or for no reason, *see Reps. Comm. for Freedom of the Press v. Rokita*, 751 F. Supp. 3d 931, 940 (S.D. Ind. 2024), *aff'd*, 147 F.4th 720 (threat of buffer law's enforcement credible in light of "the number of law enforcement departments—let alone individual officers—in Indiana" authorized to issue an order under the statute). And as the Supreme Court has often underlined, pre-enforcement review is especially urgent where a law "allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity," *City of Lakewood*, 486 U.S. at 755, because the statute's standardless sweep "intimidates parties into censoring their own speech, even if the discretion and

27

power are never actually abused," *id.* at 757; *Thornhill v. Alabama*, 310 U.S. 88, 97–98 (1940) (same with respect to a vague criminal statute).

Finally, that injury is fairly traceable to Defendants, who are charged with enforcing the statute in the settings where Plaintiffs' reporters routinely encounter officers, and a preliminary injunction would redress those injuries for much the same reason. *See Deep S. Today*, 779 F. Supp. 3d at 805 (injury caused by police buffer law redressable by enjoining heads of law enforcement agencies "empowered to give an order under the Act" and relevant prosecuting authorities). And none of the Defendants, for that matter, have "clearly disavowed enforcement." *Yoder v. Bowen*, 146 F.4th 516, 525 (6th Cir. 2025).

Defendant Funk is the clearest case, having made no representations of any kind about his past, present, or future enforcement of the law. Defendant Long, for his part, represents only that THP has "issued no citations pursuant to 2025 Tenn. Pub. Acts, ch. 409," Perry Decl. ¶¶ 4–5, R.30-1, PageID#315, leaving unsaid whether the agency intends to do so in the future and whether THP officers have enforced the statute by issuing "order[s] . . . to stop approaching or to retreat," Tenn. Code Ann. § 39-16-612(a). Similarly, Plaintiffs

28

understand MNPD's commitment to "refrain from enforcing the statute," Gilder Decl. ¶¶ 4–5, R.33-1, PageID#321–322, to be a commitment not to make arrests or issue citations under the statute— not a commitment not to issue orders that trigger liability. But 'enforcement' of the law has already taken place when an order to retreat issues. *See Morales*, 527 U.S. at 58 (plurality opinion) (noting that "the dispersal order itself is an unjustified impairment of liberty").

This Court has made clear, in that vein, that "a directive by an official can establish a credible threat of enforcement because it initiates the formal enforcement process," even where "[t]he enforcement process did not need to proceed further" to inflict its chilling effect. *Kareem*, 95 F.4th at 1026 (citation, internal quotation marks, and alteration omitted). Put differently, an "order[] . . . to stop approaching or to retreat" triggers the intimidating prospect of criminal liability whether or not an arrest is made in real-time, Tenn. Code Ann. § 39-16-612(a), so Defendants' assertions that no arrests have been made are cold comfort. That "could just as well indicate that speech has already been chilled." *Kareem*, 95 F.4th at 1026 (citation omitted).

29

To return to brass tacks:  The record evidence established that Plaintiffs' reporters approach "within 25 feet of law enforcement officers at least five of the seven days of the week, covering anything from the state legislature to local government happenings to crime or accident scenes to protests and large-scale events where Tennessee Highway Patrol ("THP") and Metropolitan Nashville Police Department ("MNPD") officers will be present."  Rose Decl. ¶ 5, R.19-6, PageID#124. The evidence established, too, that before the law's passage it was "very routine to get asked to step behind crime tape or to move to a staging area once law enforcement gets set up" at the scene of breaking news. Cordan Decl. ¶ 7, R.19-2, PageID#104; *see also* Partipilo Decl. ¶ 6, R.28, PageID#269 (when covering Tennessee Highway Patrol, "[i]t's common to be asked to move out of the way").  And Defendants do not dispute that their officers continue to issue orders to stop approaching or retreat and that disobeying those instructions is now a criminal offense.

The predictable result is that Plaintiffs must now "censor [themselves] to avoid violating the statute[]." *Yoder,* 146 F.4th at 525 (citation and internal quotation marks omitted).  That is, as the

30

Seventh Circuit held on a substantially identical record, a classic case for standing under Article III.  *See Reps. Comm.*, 147 F.4th at 728.

### B.   Plaintiffs are likely to succeed in demonstrating that the buffer-zone law is void for vagueness on its face.

On the merits, the clearest basis for relief in this case is vagueness.  *See Reps. Comm.*, 147 F.4th at 731 (finding Indiana's police buffer law void for vagueness on its face); *Deep S. Today*, 779 F. Supp. 3d at 824 (finding Louisiana's police buffer law void for vagueness on its face).  Even a statute with no impact on First Amendment rights is "impermissibly vague"—and therefore a violation of the Fourteenth Amendment's Due Process Clause—if it "fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests."  *Morales*, 527 U.S. at 52 (plurality opinion).  The buffer law falls short on two independent grounds. Because an officer can order individuals to retreat for any reason or no reason, including "because he had a bad breakfast," *Reps. Comm.*, 147 F.4th at 731, the statute "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits," *Morales*, 527 U.S. at 56 (plurality opinion), and it "encourages arbitrary or discriminatory enforcement," *Reps. Comm.*, 147 F.4th at 730.

31

Start with arbitrary discretion, the "more important aspect of vagueness doctrine." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). In *City of Chicago v. Morales*, the Supreme Court squarely held that a lawful-order statute "violates the requirement that a legislature establish minimal guidelines to govern law enforcement," 527 U.S. at 60 (majority opinion) (citation and internal quotation marks omitted), if it "does not provide any guidance to the officer deciding whether such an order should issue" in the first place, *id.* at 62; *see also Reps. Comm.*, 147 F.4th at 731. Or to approach the question from the opposite direction, if such a law does not "limit dispersal authority to situations in which dispersal is *necessary* to ensure [public] safety and order," it "permits law enforcement too much discretion" in violation of due process. *Bell v. Keating*, 697 F.3d 445, 463 (7th Cir. 2012). That shortcoming invalidates a statute on its face—the text either does or does not contain "minimal guidelines to govern law enforcement," *Morales*, 527 U.S. at 60 (majority opinion) (citation omitted). In other words, "[t]he ordinance is unconstitutional, not because a policeman applied this discretion wisely or poorly in a particular case, but rather

32

because the policeman enjoys too much discretion in *every* case." *Id.* at 71 (Breyer, J., concurring in part and concurring in the judgment).

Like the buffer-zone statutes that Tennessee copied, this one poses just that problem because its text "offers no guidance to the officer deciding whether a do-not-approach order should issue in the first place." *Reps. Comm.*, 147 F.4th at 731 (citation, internal quotation marks, and alteration omitted); *see also Deep S. Today*, 779 F. Supp. 3d at 824 (enjoining Louisiana's police buffer law on similar grounds). Countless individuals pass within 25 feet of officers in scenarios covered by the law, but whether to order some, all, or none of those individuals to stop or retreat is a decision about which the text simply has nothing to say. Indeed, Defendants agreed in the District Court that the statute contains no enforcement standard, arguing instead that "*preexisting, implicit* police authority" somewhere in the ether would provide that limiting principle. Defs. Long & Funk's Resp. in Opp'n at 2, R.20, PageID#142. But the Supreme Court made clear in *Shuttlesworth* and *Morales* that a law punishing failure to obey orders must, itself, offer "guidance to the officer deciding whether such an order should issue." *Morales*, 527 U.S. at 62 (majority opinion). This statute does not.

33

For purposes of that question, Tennessee's statute differs from the ones already enjoined in Indiana and Louisiana only in that it applies when an officer is engaged in certain duties (involving a traffic stop, the scene of an alleged crime, or a threat to safety) rather than all duties. *See* Tenn. Code Ann. § 39-16-612.  But that difference does nothing to supply the missing standard.  *See Morales*, 527 U.S. at 61–62 (majority opinion) (that dispersal ordinance "[did] not apply to people who are moving . . . does not even address the question of how much discretion the police enjoy in deciding which stationary persons to disperse").

Set aside the fact that those three scenarios are broad enough to net in most of the settings in which the press and public encounter law enforcement officers.  More fundamentally, what the statute's plain text does *not* require is any causal relationship between the order to retreat and the duties the officer "is lawfully engaged in."  Tenn. Code Ann. § 39-16-612.  Instead, the only link is temporal.  *Cf. Feliciano v. Dep't of Transp.*, 605 U.S. 38, 45 (2025) (statute providing benefits for active-duty service "during a national emergency" required only a temporal rather than a "substantive" connection between duties and emergency). If the officer "is lawfully engaged in the execution of official duties

involving" those scenarios when the order issues, Tenn. Code Ann. § 39-16-612, failure to obey is a crime, period, regardless of whether the order has anything to do with an officer's ability to perform their duties.

Comparison to background Tennessee law makes that point clear. Tennessee's disorderly conduct statute already prohibits refusal "to obey an official order to disperse *issued to maintain public safety* in *dangerous* proximity to a fire, hazard or other emergency"—language that makes clear an order must have a given purpose (safety) and that an individual's proximity must itself jeopardize that purpose. Tenn. Code Ann. § 39-17-305(a)(2) (emphasis added); *see also Howard v. Smith Cnty.*, No. 2:10-0009, 2011 WL 4361486, at *7 (M.D. Tenn. Sept. 19, 2011) (authority "to direct, control, or regulate traffic" authorized "commands to step back" while officer was "engaged in a traffic stop" (quoting Tenn. Code Ann. § 55-8-104)). But this statute omits any such link between the duties the officer is performing and the order. As a result, limiting the law's scope to crime scenes or traffic stops does no more to cure the arbitrary-discretion problem than limiting its enforcement to Mondays or Tuesdays would. Either way, the statute does nothing to guide officers in distinguishing "innocent conduct,"

35

*Morales*, 527 U.S. at 60 (majority opinion), from conduct with the "harmful purpose or effect" that lawmakers intended to address, *id.* at 62. And as a result, every application "entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat," *id.* at 60 (citation omitted); *see Reps. Comm.*, 147 F.4th at 733–34 (same).

For overlapping reasons, the statute fails to provide fair notice. In the context of liability for failure to obey a law enforcement order, due process requires that a law provide "warning about the behavior that prompts a lawful dispersal order," *Bell*, 697 F.3d at 462, not just notice of what to do *after* an arbitrary order is issued, *see Agnew v. District of Columbia*, 920 F.3d 49, 60 (D.C. Cir. 2019) (where the standards for issuing a move-on order are themselves vague, "[a] person's knowing failure to obey such an order could do nothing either to cure the officer's lawless discretion or to establish the individual's culpability"). Otherwise, a statute that read 'do what any officer tells you to do' would provide fair notice despite reducing the public's legal obligations to pure, unpredictable discretion. *See Shuttlesworth*, 382 U.S. at 93 (criminalizing "refus[al] or fail[ure] to comply with any lawful order, signal or direction of a police officer" would, read literally, raise

36

"constitutional doubts of the utmost gravity"). Here, the buffer-zone statute authorizes officers to order an individual to retreat for any reason (or no reason), and "[s]uch an order cannot retroactively give adequate warning of the boundary between the permissible and the impermissible," *Morales*, 527 U.S. at 59 (plurality opinion); *see also Deep S. Today*, 779 F. Supp. 3d at 824 (same). Each time Plaintiffs' reporters approach within 25 feet during their own work, whether an officer will opt to criminalize their conduct at a snap is a roll of the dice.

In each respect, the buffer-zone statute—like any other law that grants officers the authority "to decide arbitrarily which members of the public they will order to disperse"—is "indistinguishable from the law . . . held invalid in *Shuttlesworth v. Birmingham*." *Morales*, 527 U.S. at 58–59 (plurality opinion). Plaintiffs are therefore likely to succeed in demonstrating that the law is void for vagueness, even without reference to the statute's First Amendment harms. *See id.* at 52–53 (noting that the ordinance invalidated as void-for-vagueness did not regulate First Amendment activity and was not overbroad in a First Amendment sense). The District Court erred in attempting to analyze

37

irreparable injury without first addressing the reality that "a constitutional right is being threatened." *Bonnell*, 241 F.3d at 809.

### C.    Plaintiffs are likely to succeed in demonstrating that the buffer-zone law violates the First Amendment.

For closely related reasons, the statute poses an "ever-present potential for arbitrarily suppressing First Amendment liberties." *Shuttlesworth*, 382 U.S. at 91.  Those harms to the freedoms of speech and of the press provide an independent basis to conclude that Plaintiffs are likely to succeed on the merits, whether this Court reviews the statute on its face or as applied to the newsgathering that brings Plaintiffs' journalists within 25 feet of officers every working week.

### a.    The statute violates the First Amendment as applied to nonobstructive newsgathering.

As detailed above, Plaintiffs' reporters regularly gather and report the news within 25 feet of officers performing duties covered by the buffer-zone statute—documenting events they could neither see, nor hear, nor record if forced to retreat as far as the law requires.  The statute now authorizes any officer in the state to criminalize that otherwise-lawful activity at the drop of a hat, but the statute is not tailored to any interest Tennessee asserts.  The Act therefore violates

38

the First Amendment as applied to Plaintiffs' newsgathering.  *See Deep S. Today*, 779 F. Supp. 3d at 818 (news organizations stated an as-applied First Amendment claim against Louisiana's police buffer law).

In that analysis, where plaintiffs bring an as-applied, pre-enforcement challenge to a statute on First Amendment grounds, a court must first ask whether "as applied to plaintiffs the conduct triggering coverage under the statute" implicates the First Amendment, *Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010), and, next, whether the law satisfies the relevant degree of constitutional scrutiny as applied to "the particular speech plaintiffs propose to undertake," *id.* at 36.  Plaintiffs are likely to succeed on the merits on both fronts here.

As to the first question, this Court has made clear that the Constitution protects the right to "gather news," *CBS*, 522 F.2d at 238, including "a general First Amendment right to gather information in public settings," *Hils*, 52 F.4th at 1002.  And because "the First Amendment protects conduct and activities necessary for expression," it likewise protects "approaching" a newsworthy event in order "to carry out plaintiffs' protected monitoring and recording." *Brown*, 86 F.4th at 779; *see also Nicodemus*, 137 F.4th at 663–64 (Indiana's buffer law is

"subject to First Amendment scrutiny" on its face because it restricts access to public fora and inevitably burdens individuals attempting to document police (citation omitted)).  As the Tenth Circuit observed in the context of policing in particular, "since the First Amendment protects the right to criticize police, then *a fortiori* it protects the right to remain in the area to be able to criticize the observable police conduct," because if "police could stop criticism or filming by asking onlookers to leave," then officers could simply "bypass the Constitution." *Jordan v. Jenkins*, 73 F.4th 1162, 1169–70 (10th Cir. 2023) (citation omitted).  That is, of course, exactly what police buffer-zone statutes like Tennessee's were designed to enable—a First Amendment end run.

But the Constitution is not that easily foiled.  At a minimum, the statute regulates the 'place' of First Amendment activity—not within 25 feet of a law enforcement officer—and must confront intermediate scrutiny.  *See Pouillon*, 206 F.3d at 717 (applying intermediate scrutiny to police order "requiring [a speaker] to move"); *Nicodemus*, 137 F.4th at 668–70 (police buffer law triggers intermediate scrutiny); *Deep S. Today*, 779 F. Supp. 3d at 817–18 (same).  Thus, to survive review, the statute must be "narrowly tailored to serve a significant government

40

interest, and leave open ample alternative channels of communication."
*Nicodemus*, 137 F.4th at 664 (citation omitted). The buffer-zone statute flunks both those requirements as applied to Plaintiffs' newsgathering.

For one, criminalizing nonobstructive newsgathering advances no legitimate—let alone substantial—government interest. As other Circuits have held, newsgathering "that does not interfere with the police officers' performance of their duties is not reasonably subject to limitation." *Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011); *see also Am. C.L. Union of Ill. v. Alvarez*, 679 F.3d 583, 606 (7th Cir. 2012) (no substantial interest in restricting recording that is "not disruptive of public order or safety, and carried out by people who have a legal right to be in a particular public location and to watch and listen to what is going on around them"). But even if legitimate interests were at stake in forcing Plaintiffs' reporters to retreat, the statute's text does nothing to channel officers' discretion towards those interests; it does not hinge the power to issue an order on public safety, obstruction, or the like.

On that front, this Court's decision in *Sisters for Life*—dealing with a facial challenge to an abortion buffer zone—is especially instructive. As this Court explained, because intermediate scrutiny

41

requires proof that the state "'seriously undertook to address' the problems it faces 'with less intrusive tools readily available to it,'" *Sisters for Life*, 56 F.4th at 404 (quoting *McCullen v. Coakley*, 573 U.S. 464, 494 (2014)), a buffer zone cannot survive First Amendment review if a "no-obstruction law," whose "ends and means fit snugly," would address the state's interests while burdening substantially less speech, *id.* at 405–06. That principle controls here, where Tennessee's general disorderly conduct statute already prohibits failure to obey orders to disperse where the order is tied to "maintain[ing] public safety in dangerous proximity to a fire, hazard or other emergency." Tenn. Code Ann. § 39-17-305(a)(2). The state's traffic-enforcement statute, likewise, already authorizes "commands to step back" when issued for the purpose of controlling traffic. *Howard*, 2011 WL 4361486, at *7. That leaves *this* statute with no work to do except to punish "expressive activity that does not involve physical interference" with an officer's duties, *Brown*, 86 F.4th at 782, which advances no legitimate interest.

If that were not enough, the failure to leave open adequate alternative channels for Plaintiffs' newsgathering would likewise suffice to conclude the statute cannot survive intermediate scrutiny. "[A]udio

42

and audiovisual recording are uniquely reliable and powerful methods of preserving and disseminating news," and it is "highly unlikely that other methods could be considered reasonably adequate substitutes." *Alvarez*, 679 F.3d at 607.  And as Plaintiffs' reporters described, 25 feet is too great a distance to visually observe police performing their official functions, to record audio, or to conduct interviews.  Elliott Decl. ¶¶ 7, 10 R.19-4, PageID#113–114; Dare Decl. ¶ 8, R.19-3, PageID#109; *see also Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 377–78 (1997) (noting that 15 feet is beyond "normal conversational distance").  As a result, in practice, the buffer-zone statute is a flat ban on each of those activities, not just an incidental burden.  *See Sisters for Life*, 56 F.4th at 405 (buffer zone prevents "close, personal conversations" (citation omitted)).  On that ground, too, the law violates the First Amendment as applied to Plaintiffs' nonobstructive newsgathering.

## b. The statute violates the First Amendment on its face.

The statute violates the First Amendment on its face for much the same reasons.  Even setting aside the fact that the statute can be triggered by "approaching" newsworthy events in order "to carry out plaintiffs' protected monitoring and recording," *Brown*, 86 F.4th at 779,

this Court and the Supreme Court have both made clear that physical buffer zones trigger First Amendment scrutiny on their face because they necessarily "restrict[] access to traditional public fora," even where the statute "says nothing about speech on its face," *McCullen*, 573 U.S. at 476; *see also Sisters for Life,* 56 F.4th at 405 (applying intermediate scrutiny in facial challenge to abortion buffer zone); *Nicodemus*, 137 F.4th at 663–64 (same in facial challenge to Indiana's police buffer law).

Tennessee's police buffer-zone statute cannot survive that scrutiny. As just described, rather than peg the authority to issue an order to public safety, security, or order, the law allows officers to issue an order for any reason or for no reason—because the moon is high or the tides are low. *See Bell*, 697 F.3d at 459 (statute authorizing dispersal orders that could be issued "to individuals exercising protected First Amendment rights" without any showing that dispersal would be "necessary" violated First Amendment on its face). Tennessee cannot explain, for that matter, why "available generic criminal statutes" fail to address the government interests the buffer-zone statute notionally serves. *McCullen*, 573 U.S. at 492; *see also Sisters for Life*, 56 F.4th at 405 (invalidating 10-foot buffer zone on that ground).

44

All of these difficulties are exacerbated by the "floating nature" of Tennessee's buffer zone. *Nicodemus*, 137 F.4th at 670. In *Nicodemus*, a facial challenge to Indiana's police buffer-zone statute, the Seventh Circuit explained that Supreme Court precedent recognizes a critical distinction between two kinds of buffer-zone laws: those with which an individual can comply "by remaining in place," *id.* at 669, and those which float instead, *see id.* at 670. "[F]loating buffer zones burden more speech than necessary to serve the relevant governmental interests" because it is too difficult "to know how to remain in compliance," *Schenck*, 519 U.S. at 378–79; members of the press and public must be "in constant motion and constantly on alert" to make sure they do not stray within the prohibited distance, *Nicodemus*, 137 F.4th at 670.

The Seventh Circuit ultimately concluded—while reserving judgment on as-applied challenges, *see id.*—that Indiana's statute was not facially overbroad under the First Amendment because it only "allow[ed] officers to order people to stop approaching, but not to move away," *id.* at 669. (As already discussed above, the Seventh Circuit nevertheless concluded in a separate case that the statute was unconstitutionally vague.) But here in Tennessee, the statute's plain

45

text differs from Indiana's on exactly that point: it authorizes "order[s] . . . to stop approaching *or to retreat*." Tenn. Code Ann. § 39-16-612 (emphasis added). As a result, this statute poses exactly the First Amendment difficulties the Seventh Circuit construed Indiana's to avoid—Plaintiffs' reporters face a staggering risk of "inadvertent non-compliance" when an officer, to say nothing of multiple officers, summons a 25-foot bubble. *Nicodemus*, 137 F.4th at 670. The result is that the law burdens wildly "more speech than necessary to serve the relevant governmental interests," *Schenck*, 519 U.S. at 378–79.

Ultimately, the First Amendment complements what due process likewise makes clear: A law that "says that a person may stand on a public sidewalk . . . only at the whim of any police officer" violates the Constitution, *Shuttlesworth*, 382 U.S. at 90, whether because it provides for "government by the moment-to-moment opinions of a policeman on his beat," *id.* (citation omitted), or because of "its ever-present potential for arbitrarily suppressing First Amendment liberties," *id.* at 91. This statute poses just that danger—including to the work Plaintiffs carry out within 25 feet of officers every day. Because "a constitutional right is being threatened or impaired" each

46

day it remains in effect, the District Court erred by failing to consider that harm in evaluating irreparable injury. *Bonnell*, 241 F.3d at 809.

## II. Plaintiffs are likely to suffer irreparable harm without a preliminary injunction against the statute's enforcement.

This Court has made the point again and again: "[W]hen reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Vitolo*, 999 F.3d at 365 (quoting *Bonnell*, 241 F.3d at 809 (alteration in original)); *see also Dutton*, 2024 WL 3831884, at *4 (emphasizing, "as we have many times before, that 'when constitutional rights are threatened or impaired, irreparable injury is presumed'" (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (alteration omitted))). As a result, "the questions of harm to the parties and the public interest generally cannot be addressed properly in the First Amendment context without first determining if there is a constitutional violation." *Connection Distrib. Co.*, 154 F.3d at 288. Here, the District Court's irreparable-harm analysis was flawed from the get-go because the court approached the analysis out of order, addressing irreparable injury in a vacuum without any consideration of the "logically antecedent" question of

47

likelihood of success. *Dutton*, 2024 WL 3831884, at \*2. But the two inquiries are "inseparably linked" in constitutional cases like this one. *Jones v. Caruso*, 569 F.3d 258, 266 (6th Cir. 2009) (citation omitted)

In holding otherwise, the District Court relied exclusively on *D.T. v. Sumner County Schools*, 942 F.3d 324 (6th Cir. 2019), a case that neither party had raised in the briefing or argument before the District Court. And understandably so: *D.T.* did not involve a claim that "a constitutional right [was] being threatened or impaired." *Vitolo*, 999 F.3d at 365 (citation omitted). Instead, the plaintiffs in that case sought an injunction to prevent the state from charging them with truancy for withdrawing their child from school on the theory that such charges would have been preempted. *D.T.*, 942 F.3d at 326. And while the plaintiffs "want[ed] the option of removing him from school again in the future," they had no concrete plans to do so, and the prospect of a truancy prosecution had no present impact on their conduct. *Id.*

Here, by comparison, Plaintiffs want to exercise First Amendment rights "'*now*' rather than at some unknown future date," *Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 761 (6th Cir. 2025) (en banc) (citation omitted) (distinguishing *D.T.* in a First

48

Amendment case), and the buffer-zone statute likewise "chang[es] how they behave when conducting newsgathering activities" *now* rather than at some unknown future date, *Reps. Comm.*, 147 F.4th at 728.  As Plaintiffs' reporters described, before the law passed, they might respond to instructions to retreat "by backing up by 3–6 feet," Taylor Decl. ¶ 16, R.19-7, PageID#132; might "go elsewhere and look for places that have not been blocked off to get the shot," Dare Decl. ¶ 9, R.19-3, PageID#109; might "wait until [they were] physically pushed back," Partipilo Decl. ¶ 6, R.28, PageID#269; or might refuse entirely and "explain to police officers that they don't have any right to tell [them] where [they] can and cannot be as long as [they are] not breaking any laws and [] not interfering with them doing their jobs," *id.* ¶ 13, PageID#271.  But now the choice is stark: Comply or face liability.

The chilling effect that accompanies that unbridled discretion—"intimidat[ing] parties into censoring their own speech"—is a present-tense harm, inflicted "even if the discretion and power are never actually abused." *City of Lakewood*, 486 U.S. at 757.  And ignoring it led the District Court to a startling result.  On its view, Plaintiffs must wait for their reporters to be "arrested because they didn't honor the

49

order of the officer"—and even then the District Court only granted that an arrest "could" be relevant to irreparable harm. Hr'g Tr. at 64:5–9, R.44, PageID#413. But of course, by that point irreparable injury has already been inflicted; Plaintiffs' journalists cannot go back to the scene of the news later to document events that unfolded while they were detained. *See Detroit Free Press v. Ashcroft*, 303 F.3d 681, 710–11 (6th Cir. 2002) (holding that, when journalists are denied access to a newsworthy proceeding in the first instance, "no subsequent measures can cure this loss"). And by that point, the most basic premise of pre-enforcement review—that "it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights," *Steffel*, 415 U.S. at 459—has already been vitiated. In effect, rather than ask whether Plaintiffs had "demonstrate[d] that irreparable injury is *likely* in the absence of an injunction," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), the District Court declined to act until Plaintiffs could prove irreparable injury had already happened.

That was error. For all the reasons given above, Plaintiffs established that they were likely to succeed in demonstrating that

50

Tennessee's buffer-zone statute is unconstitutional under the Due Process Clause and the First Amendment.  Plaintiffs established, too, that their reporters will likely receive orders under the statute before this case is over, because "they conduct newsgathering activities in proximity to police officers every day" in situations where the law applies.  *Reps. Comm.*, 147 F.4th at 728; *see* Rose Decl. ¶ 5, R.19-6, PageID#124; Taylor Decl. ¶ 5, R.19-7, PageID#129.  And because each order puts Plaintiffs' journalists to an immediate choice between "self-censorship" and "flouting the buffer law," *Reps. Comm.*, 147 F.4th at 728—a deterrent to the exercise of First Amendment rights that cannot be remedied after final judgment—Plaintiffs established irreparable harm.  The District Court's contrary conclusion should be reversed.

## III.   The remaining equitable factors favor preliminary relief.

Much like irreparable harm, the remaining preliminary-injunction factors should have followed the merits here.  *See Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 642 (6th Cir. 2025) ("In constitutional cases, success on the merits is typically dispositive because when constitutional rights are threatened or impaired, irreparable injury is presumed, no cognizable harm results

51

from stopping the conduct, and it's always in the public interest to prevent constitutional violations." (citation and internal quotation marks omitted)).  And while the District Court erroneously failed to reach them, this Court can and should "evaluate[] all the preliminary injunction factors" for itself "in order not to unduly prolong the resolution of the parties' underlying dispute," *Certified Restoration Dry Cleaning Network*, 511 F.3d at 543, and "remand for prompt entry of a preliminary injunction," *Cath. Charities*, 162 F.4th at 696; *see also Sisters for Life*, 56 F.4th at 409 (reversing denial of preliminary injunction and remanding with instructions to enter one immediately).

For each factor, after all, the analysis is straightforward. "[I]f the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001).  That is particularly true here, where background Tennessee disorderly conduct and traffic regulation statutes already empower officers to issue more narrow orders to achieve the interests the buffer law purportedly serves.  *See* Tenn. Code Ann. § 39-17-305; Tenn. Code Ann. § 55-8-104.

52

And as to the public interest factor, "when a constitutional violation is likely[,] the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights." *Am. C.L. Union Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 649 (6th Cir. 2015) (citation omitted) (cleaned up). Here, enjoining the buffer law is necessary to prevent the violation of Plaintiffs' Due Process and First Amendment rights. And for all of the reasons already described above, an injunction that shields the press from the statute's chilling effects—relieving Plaintiffs of the threat of arrest and the need for self-censorship—would directly serve a "major purpose" of the First Amendment: "to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966).

This Court should reverse and remand with instructions to enter the requested preliminary injunction.

## CONCLUSION

Plaintiffs respectfully urge this Court to reverse and remand with instructions to enter an appropriate preliminary injunction.

Dated: April 28, 2026                     Respectfully submitted,

                                          */s/ Grayson Clary*
                                          Grayson Clary

53

*Counsel of Record*
Paul R. McAdoo
REPORTERS COMMITTEE
 FOR FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, DC 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
gclary@rcfp.org
pmcadoo@rcfp.org

*Attorneys for Plaintiffs-Appellants*

54

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 10,470 words, excluding the parts exempted by Fed. R. App. P. 32(f) and Cir. R. 32(b)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and the type-style requirements of Fed. R. App. P. 32(a)(6), because it is set in 14-point Century Schoolbook, a proportionally spaced typeface, and was prepared using Microsoft Word for Mac (version 16.88).

Date: April 28, 2026

*/s/ Grayson Clary*
Grayson Clary
  *Counsel of Record*
REPORTERS COMMITTEE
  FOR FREEDOM OF THE PRESS

## CERTIFICATE OF SERVICE

I, Grayson Clary, do hereby certify that I have filed the foregoing Brief for Plaintiffs-Appellants electronically with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the appellate CM/ECF system on April 28, 2026.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Date: April 28, 2026

*/s/ Grayson Clary*
Grayson Clary
  *Counsel of Record*
REPORTERS COMMITTEE
  FOR FREEDOM OF THE PRESS

# **ADDENDUM**

Page

Designation of Court Documents.............................................. A-2

# DESIGNATION OF COURT DOCUMENTS

*Gannett Co., Inc., et al. v. Long, et al.*
No. 3:25-cv-00830 (M.D. Tenn.)

| Record# | Description | PageID# |
|---|---|---|
| 1 | Complaint | 1–21 |
| 19 | Plaintiffs' Motion for Preliminary Injunction | 67–69 |
| 19-1 | Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction | 70–101 |
| 19-2 | Declaration of Andy Cordan (WKRN/Nexstar Media Group, Inc.) | 102–105 |
| 19-3 | Declaration of Don Dare (WATE/Nexstar Media Group, Inc.) | 106–110 |
| 19-4 | Declaration of Stephen Elliott (Nashville Banner) | 111–116 |
| 28 | Declaration of John Partipilo (Tennessee Lookout) | 268–271 |
| 19-6 | Declaration of Michael Rose (WTVF/Scripps Media, Inc.) | 122–126 |
| 19-7 | Declaration of Sarah Grace Taylor (Nashville Banner) | 127–132 |
| 20 | Commissioner Long and General Funk's Response in Opposition to Motion for Preliminary Relief | 135–158 |
| 20-1 | Pub. Ch. No. 409 (S.B. 30) | 159–162 |
| 21 | Defendant John Drake's Response to Motion for Preliminary Injunction | 241–242 |

A-2

| 24 | Plaintiffs' Reply in Further Support of Motion for Preliminary Injunction | 248–257 |
|---|---|---|
| 26 | Order Setting Preliminary Injunction Hearing | 265 |
| 29 | Plaintiffs' Hearing Exhibit List | 272–273 |
| 29-7 | Tennessee Lookout Article | 305–310 |
| 30-1 | Declaration of Colonel Matt Perry (Tennessee Highway Patrol) | 314–315 |
| 33-1 | Declaration of Chris Gilder (Metro Nashville Police Department) | 321–322 |
| 34 | Order Continuing Preliminary Injunction Hearing | 323 |
| 38 | Order Continuing Preliminary Injunction Hearing | 328 |
| 40 | Order Denying Preliminary Injunction | 331 |
| 44 | Transcript of Preliminary Injunction Hearing | 350–415 |
| 46 | Notice of Appeal | 417 |