No. 26-5182

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

GANNETT COMPANY, INC.; GRAY LOCAL MEDIA, INC.;
NASHVILLE PUBLIC MEDIA, INC, *dba* NASHVILLE BANNER
PUBLISHING COMPANY; NEXSTAR MEDIA GROUP, INC.,
SCRIPPS MEDIA, INC.; STATES NEWSROOM *dba* TENNESSEE
LOOKOUT; TEGNA INC.,

*Plaintiffs-Appellants*,

*v.*

JEFF LONG, *in his official capacity as Commissioner of the Tennessee Department of Safety and Homeland Security*; GLENN R. FUNK, *in his official capacity as District Attorney General for Nashville & Davidson County, Tennessee*; JOHN DRAKE, *in his official capacity as Chief of Metropolitan Nashville Police Department*,

*Defendants-Appellees.*

---

On Appeal from the United States District Court for the
Middle District of Tennessee
Case No. 3:25-cv-00830 (Hon. William L. Campbell, Jr.)

---

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

[*Caption Continued on Inside Cover*]

Grayson Clary
 *Counsel of Record*
Paul R. McAdoo (BPR No. 034066)
REPORTERS COMMITTEE
 FOR FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, DC 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
gclary@rcfp.org
pmcadoo@rcfp.org

*Counsel for Plaintiffs-Appellants*

ii

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

SUMMARY OF ARGUMENT..................................................... 1

ARGUMENT.......................................................................... 4

    I.    Plaintiffs are likely to demonstrate standing. ........................... 4

        A.    Plaintiffs have standing to vindicate their own rights. ...... 5

        B.    Plaintiffs face a credible threat of enforcement. ................ 8

    II.    Plaintiffs are likely to succeed on the merits............................13

        A.    The buffer-zone statute is void for vagueness....................15

        B.    The buffer-zone statute violates the First Amendment.....22

            a.    The statute prompts First Amendment scrutiny, on its face and as applied to Plaintiffs' conduct. ...................22

            b.    The statute cannot survive any degree of First Amendment scrutiny. ...............................................26

    III.    The remaining equitable factors likewise favor Plaintiffs.........29

CONCLUSION...................................................................31

CERTIFICATE OF COMPLIANCE ......................................33

CERTIFICATE OF SERVICE .............................................34

iii

# TABLE OF AUTHORITIES

**Cases**

*Am. C.L. Union of Ill. v. Alvarez,*
679 F.3d 583 (7th Cir. 2012)................................................................ 6

*Ass'n of Am. Physicians & Surgeons v. U.S. FDA,*
13 F.4th 531 (6th Cir. 2021) ............................................................ 7

*Blankenship v. Louisville-Jefferson Cnty.,*
162 F.4th 644 (6th Cir. 2025) ............................................................29

*Block v. Canepa,*
175 F.4th 642 (6th Cir. 2026) ............................................................10

*Boddie v. ABC, Inc.,*
881 F.2d 267 (6th Cir. 1989)..............................................................24

*Bonnell v. Lorenzo,*
241 F.3d 800 (6th Cir. 2001)..............................................................30

*Cantrell v. DeKalb Cnty.,*
78 S.W.3d 902 (Tenn. Ct. App. 2001) ................................................21

*Cath. Charities v. Whitmer,*
162 F.4th 686 (6th Cir. 2025) ............................................................31

*CBS Inc. v. Young,*
522 F.2d 234 (6th Cir. 1975).......................................................3, 6, 8

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.,*
162 F.4th 631 (6th Cir. 2025) ............................................................31

*Citizens United v. FEC,*
558 U.S. 310 (2010) .....................................................................6, 24

*City of Chicago v. Morales,*
527 U.S. 41 (1999) .............................................. 1, 2, 14, 15, 18, 19, 31

*City of Lakewood v. Plain Dealer Publ'g Co.,*
486 U.S. 750 (1988) ....................................................................16

*Colten v. Kentucky,*
407 U.S. 104 (1972) ...............................................................24, 25

*Conley v. City of West Des Moines,*
157 F.4th 946 (8th Cir. 2025) ......................................................... 6

*D.T. v. Sumner Cnty. Schs.,*
942 F.3d 324 (6th Cir. 2019)............................................................ 2

*Deep South Today v. Murrill,*
779 F. Supp. 3d 782 (M.D. La. 2025),
*appeal docketed*, No. 25-30128 (5th Cir. Mar. 7, 2025) ....................... 1

*Detroit Free Press v. Ashcroft,*
303 F.3d 681 (6th Cir. 2002)............................................................ 3

*Dutton v. Shaffer,*
No. 23-5850, 2024 WL 3831884 (6th Cir. Aug. 15, 2024)....................30

*Ehlers v. City of Rapid City,*
846 F.3d 1002 (8th Cir. 2017)..........................................................21

*Haggerty v. Tex. S. Univ.,*
391 F.3d 653 (5th Cir. 2004)............................................................21

*Hess v. Oakland Cnty.,*
174 F.4th 981 (6th Cir. 2026) ..........................................................30

*Hils v. Davis,*
52 F.4th 997 (6th Cir. 2022)......................................................23, 27

*Illinois v. McArthur,*
   531 U.S. 326, 336–37 (2001).............................................................21

*In re Express-News Corp.,*
   695 F.2d 807 (5th Cir. 1982)............................................................ 6

*Jones v. Caruso,*
   569 F.3d 258 (6th Cir. 2009)............................................................30

*Jordan v. Jenkins,*
   73 F.4th 1162 (10th Cir. 2023) ....................................................22, 24

*Kareem v. Cuyahoga Cnty. Bd. of Elections,*
   95 F.4th 1019 (6th Cir. 2024) ........................................................8, 11

*King v. Ambs,*
   519 F.3d 607 (6th Cir. 2008)............................................................25

*Knight v. City of New York,*
   164 F.4th 173 (2d Cir. 2026)............................................................10

*Kolender v. Lawson,*
   461 U.S. 352 (1983) ...............................................................15, 19, 21

*Kowalski v. Tesmer,*
   543 U.S. 125 (2004) ....................................................................... 7

*Lichtenstein v. Hargett,*
   83 F.4th 575 (6th Cir. 2023)............................................................24

*McCullen v. Coakley,*
   573 U.S. 464 (2014) ...............................................................23, 27, 29

*Minnesota Voters Alliance v. Mansky,*
   585 U.S. 1 (2018) ...........................................................................28

*Moody v. Michigan Gaming Control Bd.,*
   847 F.3d 399 (6th Cir. 2017).......................................................... 7

*Nicodemus v. City of South Bend*,
137 F.4th 654 (7th Cir. 2025) .................................................22, 26, 27

*Oregon v. Illig-Renn*,
142 P.3d 62 (Or. 2006) ....................................................................21

*Patton v. Fitzhugh*,
131 F.4th 383 (6th Cir. 2025) ......................................................... 4

*Pouillon v. City of Owosso*,
206 F.3d 711 (6th Cir. 2000)..........................................................25

*Reps. Comm. for Freedom of the Press v. Rokita*,
147 F.4th 720 (7th Cir. 2025) ...........1, 3, 5, 9, 10, 11, 12, 13, 14, 15, 22

*Reps. Comm. for Freedom of the Press v. Rokita*,
751 F. Supp. 3d 931 (S.D. Ind. 2024),
*aff'd*, 147 F.4th 720 (7th Cir. 2025) ...................................................28

*Rover Pipeline LLC v. Zwick*,
No. 22-3370, 2022 WL 17336502 (6th Cir. Nov. 30, 2022)................... 7

*S.H.A.R.K. v. Metro Parks Serving Summit Cnty.*,
499 F.3d 553 (6th Cir. 2007)..............................................26, 27, 28

*Sessions v. Dimaya*,
584 U.S. 148 (2018) ........................................................................19

*Shuttlesworth v. City of Birmingham*,
382 U.S. 87 (1965) ......................................................2, 15, 16, 17, 22

*Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*,
56 F.4th 400 (6th Cir. 2022) ...........................................................23

*Speech First, Inc. v. Schlissel*,
939 F.3d 756 (6th Cir. 2019)...........................................................11

*Steffel v. Thompson*,
  415 U.S. 452 (1974) ................................................................13

*Thompson v. DeWine*,
  976 F.3d 610 (6th Cir. 2020).................................................30

*United States v. Garzon*,
  119 F.3d 1446 (10th Cir. 1997)..............................................21

*United States v. Lopez*,
  929 F.3d 783 (6th Cir. 2019)..................................................19

*Weed v. Jenkins*,
  873 F.3d 1023 (8th Cir. 2017)................................................21

*White v. United States*,
  601 F.3d 545 (6th Cir. 2010)..................................................10

## Statutes

Tenn. Code Ann. § 39-11-101....................................................20

Tenn. Code Ann. § 39-11-404...........................................2, 5, 8

Tenn. Code Ann. § 39-16-602..................................................... 9

Tenn. Code Ann. § 39-16-612................................. 5, 9, 11, 12, 13, 21, 26

Tenn. Code Ann. § 39-17-305................................................9, 20

Tenn. Code Ann. § 40-35-111..................................................... 6

Tenn. Code Ann. § 55-8-104....................................................... 9

## Other Authorities

Rachel Harmon, *Law and Orders*,
  123 Colum. L. Rev. 943 (2023) ......................................2, 4, 16

## SUMMARY OF ARGUMENT

Every court to address the question agrees that a police buffer-zone law violates the Constitution if "the buffer law offers no 'guidance to the officer deciding whether [an order] should issue' in the first place." *Reps. Comm. for Freedom of the Press v. Rokita*, 147 F.4th 720, 731 (7th Cir. 2025) (quoting *City of Chicago v. Morales*, 527 U.S. 41, 62 (1999) (majority opinion)); *Deep S. Today v. Murrill*, 779 F. Supp. 3d 782, 824 (M.D. La. 2025), *appeal docketed*, No. 25-30128 (5th Cir. Mar. 7, 2025). And every court to address the question agrees, too, that news outlets can challenge such a law before an order puts their reporters to a choice between irremediable "self-censorship" and arrest. *Reps. Comm.*, 147 F.4th at 728; *Deep S. Today*, 779 F. Supp. 3d at 804–08.

To avoid that result, Tennessee defends a statute very different than the one lawmakers actually passed, on grounds that bear no resemblance to those offered by the District Court. The mismatches only underline that the District Court should have granted relief. No matter how often Tennessee might insist that the statute "kicks in only after an officer has some reasonable basis" for an order, State Officers' Resp. at 37, the text does not say that. And the State's adventurous

1

theory of a free-floating police power to issue commands is flatly contradicted by the same law-review article from which the State derived it, which explains that "the Supreme Court has twice indicated that giving such broad authority to officers would be unconstitutional." Rachel Harmon, *Law and Orders*, 123 Colum. L. Rev. 943, 980–82 (2023) (citing *Morales*, 527 U.S. at 62 (majority opinion), and *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 88–90 (1965)).

The Defendants' non-merits arguments are no more persuasive. Remarkably, the State Officers barely discuss irreparable harm and never cite the sole case on which the District Court relied. *See* Hr'g Tr. at 62:12–22, R.44, PageID#411 (citing *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324 (6th Cir. 2019)). Instead, they devote much of their brief to the theory that news outlets are not harmed when their reporters risk arrest—all of which proceeds from the false premise that corporations cannot face liability under this law. *See* Tenn. Code Ann. § 39-11-404(a)(3) (corporations face liability for misdemeanors committed by agents). But even if that were not the case, news organizations—like other corporations—have their own First Amendment rights, which are impaired by restrictions that fall in literal terms on employees. *See*

2

*CBS Inc. v. Young*, 522 F.2d 234, 238 (6th Cir. 1975).  Defendant Drake, for his part, argues only that the Metro Nashville Police Department will not enforce the statute, before admitting in his brief's final pages that MNPD does issue—and will keep issuing—orders that trigger liability under this law.  *See* Br. of Appellee John Drake at 12–14.

That leaves this case indistinguishable from *Reps. Committee for Freedom of the Press v. Rokita*, 147 F.4th 720 (7th Cir. 2025).  Here as there, most of the same Plaintiffs "submitted affidavits from their journalist members or employees explaining that they conduct newsgathering activities in proximity to police officers every day."  *Id.* at 728.  Here as there, an officer can "invoke the buffer law just because he had a bad breakfast."  *Id.* at 731.  Here as there, the result of arbitrary discretion is "self-censorship," *id.* at 727, and "no subsequent measures can cure" lost opportunities to gather the news in real time, *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 710–11 (6th Cir. 2002).

To address that ongoing irreparable harm, the District Court should have granted Plaintiffs' motion for a preliminary injunction. This Court should reverse and remand with instructions to enter one.

## ARGUMENT

### I.   Plaintiffs are likely to demonstrate standing.

Plaintiffs' injury is straightforward: Their reporters approach "within 25 feet of law enforcement officers at least five of the seven days of the week," Rose Decl. ¶ 5, R.19-6, PageID#124, and it was already routine when this action was filed—the moment standing is measured, *see Patton v. Fitzhugh*, 131 F.4th 383, 391 (6th Cir. 2025)—for officers to instruct them to stay back in situations where the statute now punishes disobeying, *see* Cordan Decl. ¶ 7, R.19-2, PageID#104.  Indeed, no Defendant disputes Plaintiffs will likely receive such orders while this case proceeds.  *See* State Officers' Resp. at 3 (arguing such orders are "not just common" but "essential" (quoting Harmon, *supra*, at 968)); Br. for Appellee John Drake at 14 (asserting MNPD's "routine, independent authority" to "control a scene").  And it is difficult not to notice, too, that no Defendant defends the rationale of the District Court—that Plaintiffs would need to show "a particular circumstance where one of your clients' reporters is arrested because they didn't honor the order of the officer."  Hr'g Tr. at 64:3–6, R.44, PageID#413.

4

Instead, each Defendant offers their own bespoke reasons for saying it is not enough that Plaintiffs' journalists will—without interim relief—face orders that force a choice between "self-censorship" and committing a crime. *Reps. Comm.*, 147 F.4th at 728. None have merit.

## A.    Plaintiffs have standing to vindicate their own rights.

The State Officers' lead argument is that news outlets are not injured when their journalists risk arrest. Whether packaged as an argument about standing, *Ex Parte Young*, or the scope of Section 1983, it fails.[1] For one, its premise is false. Plaintiffs can face direct penalties because Tennessee subjects corporations to liability for misdemeanors committed by agents "acting within the scope of the agent's employment and on behalf of the corporation." Tenn. Code Ann. § 39-11-404(a)(3). Plaintiffs therefore risk their own fines where journalists violate the buffer-zone statute while doing their jobs. *See* Tenn. Code Ann. § 39-16-612(c) (violation is a Class B misdemeanor); Tenn. Code Ann. § 40-35-111(e)(2) (Class B misdemeanors punishable by imprisonment or fine).

---

[1]    Plaintiffs respond to the two sections together because those eight pages ultimately advance only one argument: that Plaintiffs are asserting the rights of others. *See* State Officers' Resp. at 13–21. The claim fails for the same reasons with respect to each cause of action.

Even if that weren't true, though, this would not be a third-party standing case. No one doubts corporations have their own First Amendment rights, *see Citizens United v. FEC*, 558 U.S. 310, 364 (2010), even though "[a] corporation can only speak through its agents," *Conley v. City of West Des Moines*, 157 F.4th 946, 956 (8th Cir. 2025). And this Court has therefore recognized that a news corporation has standing to challenge burdens on "*its* constitutionally guaranteed right as a member of the press to gather news," *CBS Inc.*, 522 F.2d at 238 (emphasis added), even though 'CBS' cannot literally gather anything. Other circuits have reached the same result. *See In re Express-News Corp.,* 695 F.2d 807, 808 & n.1 (5th Cir. 1982) (both news outlet and reporter had standing to challenge court rule); *cf. Am. C.L. Union of Ill. v. Alvarez*, 679 F.3d 583, 593 (7th Cir. 2012) (organization could challenge law where it intended "to use its employees and agents to audio record on-duty police officers in public places"). The buffer-zone law therefore burdens Plaintiffs' rights, not just those of any employee.

Finally, Plaintiffs would be proper parties even on a third-party standing lens. "Third-party standing permits a plaintiff to assert the constitutional or statutory rights of parties not before the court if the

6

plaintiff has a close relationship to those parties and if they are hindered in protecting their own rights." *Ass'n of Am. Physicians & Surgeons v. U.S. FDA*, 13 F.4th 531, 547 (6th Cir. 2021).   This Court has assumed even a mine-run employer can raise employees' rights, since the Supreme Court "has found a close relationship when nothing more than a buyer-seller connection was at stake." *Rover Pipeline LLC v. Zwick*, No. 22-3370, 2022 WL 17336502, at *4 (6th Cir. Nov. 30, 2022) (internal citation and quotation marks omitted)).   Here, it is more natural still to expect news organizations will be forceful advocates for the First Amendment rights of their journalists.  And individual reporters, for their part, face an obvious hindrance to bringing suit: Doing so would disrupt relationships with officers and agencies with which they must maintain effective ties to do their jobs.  *Cf. Moody v. Michigan Gaming Control Bd.*, 847 F.3d 399, 402 (6th Cir. 2017) ("deterrence from filing suit due to privacy concerns" is a hindrance).

But again, the question is academic.  Plaintiffs are directly regulated by the statute, *see* Tenn. Code Ann. § 39-11-404(a)(3), and seek to vindicate their own rights here, *see CBS Inc.*, 522 F.2d at 238.

### B.    Plaintiffs face a credible threat of enforcement.

Every party appears to agree that Plaintiffs' reporters are likely to be instructed to stay back in situations where the Act creates additional penalties for disobeying.  *See* Br. for Appellee John Drake at 14; State Officers' Resp. at 3.  That should settle the question of standing.  "[A] directive by an official can establish a credible threat of enforcement because it initiates the formal enforcement process," even where "[t]he enforcement process did not need to proceed further" to inflict a chilling effect, *Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019, 1026 (6th Cir. 2024) (citation, internal quotation marks, and alteration omitted), and no party embraces the District Court's holding that reporters should take the further step of getting arrested in order to test the statute's validity, *see* Hr'g Tr. at 64:5–6, R.44, PageID#413.

To reach a different result, all Defendants discern a difference between orders to stop approaching that make "use of this statute's power," State Officers' Resp. at 25, and those that invoke "independent authority," Br. for Appellee John Drake at 14, as a result of which they think it is unknowable whether any given order will implicate the buffer-zone law or not.  But the law's text draws no such distinction.  All

8

"order[s] to stop approaching or retreat," whatever words used and whatever authority the officer privately has in mind, now trigger new penalties, Tenn. Code Ann. § 39-16-612(c), and the possibility of overlapping authority does not defeat standing to challenge the additional chill inflicted by this law, *see Reps. Comm.*, 147 F.4th at 728.

Here again, Defendants are asking this Court to open a direct split with the Seventh Circuit, which has already explained why their argument "fails twice over." *Reps. Comm.*, 147 F.4th at 728. For one, any "overlap" between different authorities to issue an order "is not complete," because "[t]he buffer law applies in a far broader set of situations." *Id.* Plaintiffs' declarations establish that their reporters routinely approach within 25 feet of officers in situations where *only* the buffer-zone law would govern an order to stop approaching, because their presence is not obstructive, *see* Tenn. Code Ann. § 39-16-602, not "dangerous," *id.* § 39-17-305, nor an impediment to directing traffic, *see* Tenn. Code Ann. § 55-8-104. And it is the prospect of penalties under the buffer-zone law in particular, then, that forces Plaintiffs' reporters to obey the routine instructions that they would previously have contested for lack of a legal basis. *See* Partipilo Decl. ¶ 13, PageID#271.

9

"[E]ven if there were complete overlap" though, "the plaintiffs' injuries would be redressed by enjoining enforcement of the buffer law" because they face "steeper penalties for the same conduct." *Reps. Comm.*, 147 F.4th at 729. Defendants' insistence that standing is defeated whenever another authority might also apply runs into the contrary consensus of other circuits. *See Knight v. City of New York*, 164 F.4th 173, 179–80 (2d Cir. 2026) (joining "the well-reasoned view of the Seventh and Eighth Circuits that a district court's ability to reduce the plaintiff's aggregate criminal exposure can satisfy redressability").[2]

The same point makes clear why MNPD's insistence that it has disavowed enforcement rings hollow. As Defendant Drake ultimately acknowledges, Plaintiffs were correct to say that the MNPD's notional

---

[2] This Court recently indicated a standing issue would arise if another law would "inflict the *same* alleged injury on the plaintiff." *Block v. Canepa*, 175 F.4th 642, 652 (6th Cir. 2026) (citing *White v. United States*, 601 F.3d 545, 552 (6th Cir. 2010)) (emphasis added). But by 'same,' this Court meant that a plaintiff would very literally obtain no relief, because Article III requires only "partial redress." *Id.* at 649 (internal citation omitted). In *White*, for instance, the plaintiff claimed "economic injuries" from being unable to operate a business that was illegal under multiple laws. 601 F.3d at 552–553. They would therefore have the same revenue—no revenue—even if one were enjoined. *See id.* Here, by comparison, where two authorities for an order exist, "one could be charged and convicted under both, thus resulting in steeper penalties for the same conduct." *Reps. Comm.*, 147 F.4th at 729.

non-enforcement policy only extends to arrests and citations; it is not a commitment not to issue "orders to stop approaching or retreat" that trigger criminal liability. Tenn. Code Ann. § 39-16-612(a); *see also* Br. for Appellee John Drake at 12–14. But thanks to the buffer-zone law, it is now a crime to disobey the instructions that MNPD says are—and will continue to be—"routine." Br. for Appellee John Drake at 14.

Regardless whether MNPD makes an arrest in real-time, disobeying exposes Plaintiffs' reporters to prosecution by Defendant Funk, who says expressly that he will *not* disavow enforcing the law against Plaintiffs. *See* State Officers' Resp. at 26. Those orders are themselves instances of enforcement, because referral for punishment "is a real consequence that objectively chills speech . . . even if it does not result in a finding of responsibility or criminality." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019); *Kareem*, 95 F.4th at 1026. And Plaintiffs must take the same self-censoring steps in response to MNPD orders—"changing how they behave" by obeying instructions they would have contested, *Reps. Comm.*, 147 F.4th at 728—that they do in response to orders issued by any other agency.

11

It bears underlining, finally, that Defendants' view that only some unknowable fraction of "orders to stop approaching or retreat" actually count would have absurd consequences. Tenn. Code Ann. § 39-16-612(a).  Consider the classic scenario in which journalists encounter law enforcement.  When an officer at the scene of a newsworthy event tells a reporter, 'You need to stay over there,' has the buffer-zone law been triggered?  Plaintiffs and the text have a clear answer: Yes, all "order[s] to stop approaching or to retreat" within 25 feet in covered scenarios trigger the law's penalties if an individual disobeys.  Tenn. Code Ann. § 39-16-612(a).  But on Defendants' theory, the only way to find out if an order makes "use of this statute's power," State Officers' Resp. at 25, would be to defy the officer, spend the night in jail, and learn from a charging document whether the officer was privately contemplating this specific statute.  That makes no sense, and it would flout the basic premise of preenforcement review: that "it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights."  *Steffel v. Thompson*, 415 U.S. 452, 459 (1974).

12

That rule should have controlled here.  This statute attaches new penalties to First Amendment activity in which Plaintiffs engage every day.  The result is both a credible threat of enforcement and an objective chilling effect.  *See Reps. Comm.*, 147 F.4th at 728.  Because every party agrees that Plaintiffs are likely to receive "orders to stop approaching or retreat" from Defendants' officers during this litigation, Tenn. Code Ann. § 39-16-612(a), and because no party thinks the District Court was right to require proof of "a particular circumstance where one of your clients' reporters is arrested because they didn't honor the order of the officer," Hr'g Tr. at 64:3–6, R.44, PageID#413, Plaintiffs have standing to challenge the statute's standardless sweep.

## II.   Plaintiffs are likely to succeed on the merits.

MNPD does not defend the buffer-zone statute on its merits, and the State Officers do so only by reinventing it.  The text, Tennessee agrees, does not even "attempt[] to 'establish' order-issuing 'standards for the police.'"  State Officers' Resp. at 30 (quoting *Morales*, 527 U.S. at 52 (plurality opinion)).  Instead, the State maintains, officers enjoy a free-floating "police-order power" located nowhere in particular, with

13

"its own inherent limits" that trace to no statutory standard, *id.*, and this statute merely specifies additional penalties for disobedience.

Respectfully, the State's thesis makes no sense. On some level, Tennessee knows that the statute of course gives officers power they previously lacked: When the State Officers say again and again that Tennessee "lacked a bright-line rule" until this law passed, State Officer Resp. at 54; *see also id.* at 2, 5, 36, 38, 48, they mean that it was not illegal to disobey an instruction not to approach within 25 feet unless some other statute would apply. It is the buffer-zone statute that now makes that instruction an order rather than a friendly suggestion, and it is the buffer-zone statute that now must provide "guidance to the officer deciding whether such an order should issue." *Reps. Comm.* 147 F.4th at 731 (quoting *Morales*, 527 U.S. at 62 (majority opinion)).

Stripped of that defense, the State does not argue in the alternative that the statute would be constitutional as written. *See* State Officers' Resp. at 40 (distinguishing *Rokita* only on the theory that "Indiana's 'buffer law' was construed and defended much differently"). That makes this an easy case. Because Tennessee has adopted a law that allows officers "to decide arbitrarily which members

14

of the public they will order to disperse," *Morales*, 527 U.S. at 58 (plurality opinion), one that carries an "ever-present potential for arbitrarily suppressing First Amendment liberties," *Shuttlesworth*, 382 U.S. at 91, Plaintiffs are likely to succeed on the merits of their claims.

### A.    The buffer-zone statute is void for vagueness.

The most straightforward basis for relief is vagueness, as the Seventh Circuit likewise found. *See Reps. Comm.*, 147 F.4th at 731. Here as there, the law's flaw is that it offers no standard for officers to use in deciding which of the countless individuals who pass within 25 feet in covered scenarios should be ordered to stay back; an officer can just as well "invoke the buffer law just because he had a bad breakfast." *Reps. Comm.*, 147 F.4th at 731.  And as already discussed, the State Officials agree that the statute's text contains no enforcement standard. *See* State Officers' Resp. at 30.  That is classic facial vagueness.  Every application "entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat." *Kolender v. Lawson*, 461 U.S. 352, 360 (1983) (internal citation, alteration, and quotation marks omitted).

Resisting that result, Tennessee stakes everything on the claim that the statute does not "grant the police any new authority to issue an

order," State Officers' Resp. at 29, and that the relevant limits are "inherent limits" to be found brooding elsewhere, *id.* at 30. But the notion that officials will simply "act in good faith and adhere to standards absent from the ordinance's face . . . is the very presumption that the doctrine forbidding unbridled discretion disallows," *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 (1988), and Tennessee's view would nullify vagueness doctrine in its entirety.

To begin with, both *Shuttlesworth* and *Morales* contradict the State. Indeed, the law-review article that appears to have inspired Tennessee's defense makes that very point. *Compare* State Officers' Br. at 3–4 (relying on Harmon, *supra*), *with* Harmon, *supra*, at 981–82 (noting that "[t]he view that officers have inherent authority to issue commands has intuitive appeal," but that "the Supreme Court has twice indicated that giving such broad authority to officers would be unconstitutional"). Start with *Shuttlesworth*. Though Tennessee is at pains to brush it off, the Court's analysis there was not dicta. As the Court described its holding, Shuttlesworth's conviction was invalid "[b]ecause we are unable to say that the Alabama courts in this case did not judge the petitioner by an unconstitutional construction of the

16

ordinance"—in other words, the fact that the literal reading of the statute *was* unconstitutional, because an officer could order a person to move for any reason, was necessary to the disposition.  382 U.S. at 92.

That poses an obvious problem for the State.  Tennessee's argument depends on a distinction between statutes that "grant the police . . . new authority to issue an order" and those that "create[] a new 'offense'" for disobeying one, State Officers' Resp. at 29, but the statutes in *Shuttlesworth* were structured just like the buffer-zone statute, *see* 382 U.S. at 90 (statute made it "unlawful for any person to stand or loiter upon any street or sidewalk . . . after having been requested by any police officer to move on"); *id.* at 93 (statute "makes it a criminal offense for any person 'to refuse or fail to comply with any lawful order'").  On the State's theory, then, the only problem in *Shuttlesworth* was that Birmingham had bad lawyers; they should have told the Justices not to worry, because the "inherent limits" of police authority would cure any due process problem.  State Officers' Resp. at 30.  That is not, safe to say, the proposition *Shuttlesworth* stands for.

If that weren't enough, turn to *Morales*.  There too, it was holding, not dicta, that a lawful-order statute must provide "guidance to the

17

officer deciding whether such an order should issue" to comport with due process. *Morales*, 527 U.S. at 62 (majority opinion); *see also id.* at 41 (noting that the minimal-guidelines analysis in *Morales* was "the opinion of the Court"). And while Tennessee attempts to distinguish Chicago's ordinance on the theory that its "mandatory language" *required* officers to issue orders without regard for background reasonableness, State Officers Resp. at 34 (quoting *Morales*, 527 U.S. at 60), *Morales* makes express that the Court did not read that "shall" literally and placed no ultimate weight on it, *see* 527 U.S. at 62 n.32.

That again leaves the *Morales* ordinance structured just like this one: It "create[d] a criminal offense" for disobeying certain orders without sufficiently specifying when the order should issue. *Id.* at 47 (majority opinion). And though Tennessee wisely refrains from saying so, the theory that the authority to issue commands has its roots and its limits in Anglo-American tradition, rather than enacted statutory law, was the theory of the *Morales* dissent. *Id.* at 106–10 (Thomas, J., dissenting). So Tennessee needs to overturn that case, too, to prevail.

Even setting those precedents aside, though, the State's theory is incompatible on a deeper level with vagueness doctrine. The Due

18

Process Clause "require[s] that *a legislature* establish minimal guidelines to govern law enforcement." *Kolender*, 461 U.S. at 358 (internal citation omitted) (emphasis added). In other words, "the doctrine is a corollary of the separation of powers," *United States v. Lopez*, 929 F.3d 783, 785 (6th Cir. 2019) (quoting *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018) (plurality opinion)), and it "focuses on the actions of [the legislative branch], not the other branches," *id.* Here, Tennessee concedes that "no statute lays out what may justify a lawful [police] order" under the buffer-zone statute. State Officers Resp. at 4. (internal citation and quotation marks omitted)). That should end the vagueness analysis. Otherwise, if it were enough that all states have some statute that creates a policing agency at all, *see id.*, or that officers are bound by the Fourth Amendment, *see id.* at 10, no criminal statute would ever be found void for vagueness. That is obviously not the law.

Tennessee's own criminal code drives the point home. Lawmakers made express that it is the enacted code itself that should "[g]ive fair warning of what conduct is prohibited, and guide the exercise of official discretion in law enforcement." Tenn. Code Ann. § 39-11-101(2). And while Tennessee objects that the State's other lawful-order offenses lack

19

enforcement standards too, the State recites the relevant guardrails in the course of denying they exist. The disorderly-conduct statute can justify an order to stay back, but only when "issued to 'maintain public safety.'" State Officers' Br. at 29 (quoting Tenn. Code Ann. § 39-17-305(a)(2)). The traffic-control laws can justify an order to stay back, but only when issued to "regulate traffic." *Id.* (quoting Tenn. Code Ann § 55-8-104). And the generic obstruction statute can justify an order to stay back, but only when issued to prevent "obstruction." *Id.* at 4 (quoting Tenn. Code Ann. § 39-17-305(a)(2)). In granting officers discretion to issue an order for any reason or none, this law is unique.

Finally, it bears underlining that the blizzard of loosely related cases that Tennessee cites for its novel theory do not in fact endorse it. Many are Fourth Amendment decisions that weigh whether a particular order was an unreasonable seizure, not whether a police-order statute complies with due process.[3] Others ask whether officers had probable cause to arrest an individual for obstruction for disobeying

---

[3]     *See, e.g., Illinois v. McArthur*, 531 U.S. 326, 336–37 (2001); *United States v. Garzon*, 119 F.3d 1446, 1450–51 (10th Cir. 1997); *Cantrell v. DeKalb Cnty.*, 78 S.W.3d 902, 907 (Tenn. Ct. App. 2001).

20

an order on particular facts.[4]  And still others make Plaintiffs' point for them:  Due process requires that an enforcement standard be set out in a statute, by "a legislature." *Kolender*, 461 U.S. at 358 (internal citation omitted).[5]  None say that the diaphanous ether is guidance enough.

Here, though, Tennessee is very clear on that point.  Neither the buffer-zone law nor any other state law, in its view, tells an officer when to issue an "order to stop approaching or retreat."  Tenn. Code Ann. § 39-16-612(a).  This Court should take the State at its word.  Because the statute's plain text permits an officer to issue an order for "any reason"—"[a] good reason, a bad reason," or "a reason the officer just makes up," Plaintiffs are likely to succeed in demonstrating that the buffer-zone law is void for vagueness.  *Reps. Comm.*, 147 F.4th at 731.

---

[4]    *See Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 657 (5th Cir. 2004); *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1009 (8th Cir. 2017).

[5]    *See, e.g.*, *Oregon v. Illig-Renn*, 142 P.3d 62, 71 (Or. 2006) (Oregon's lawful-order statute limited to orders tethered to "published substantive law"); *Weed v. Jenkins*, 873 F.3d 1023, 1028 (8th Cir. 2017) (Missouri's failure-to-obey statute limited to orders "issued under *another* law").

21

**B.    The buffer-zone statute violates the First Amendment.**

Plaintiffs are likewise likely to succeed in showing that the statute violates the First Amendment, both on its face and applied to their daily work.  The State's defense on this front, too, is tied up in its claim that an order "cannot lawfully issue without objectively reasonable basis." State Officers Resp. at 47.  Since the statute's plain text says no such thing, the law carries an "ever-present potential for arbitrarily suppressing First Amendment liberties."  *Shuttlesworth*, 382 U.S. at 91.

**a.    The statute prompts First Amendment scrutiny, on its face and as applied to Plaintiffs' conduct.**

At the threshold, the suggestion that the law draws no First Amendment scrutiny should be startling.  For one, it again invites a direct circuit split.  *See Nicodemus v. City of South Bend*, 137 F.4th 654, 663–64 (7th Cir. 2025) (police buffer-zone prompts intermediate scrutiny on its face).  And the State's theory would have absurd results, too.  "If police could stop criticism or filming by asking onlookers to leave . . . it would allow the government to 'bypass the Constitution.'" *Jordan v. Jenkins*, 73 F.4th 1162, 1169–70 (internal citation omitted).

Nothing in this Court or the Supreme Court's precedent supports that view.  Set aside, for the moment, any back and forth over

22

'newsgathering' or 'recording' or 'the freedom of the press.' At the most basic level, the activity that Plaintiffs' reporters approach within 25 feet of officers to engage in is the same First Amendment activity at issue in *McCullen v. Coakley*, 573 U.S. 464 (2014). They walk up to people to talk to them. That is 'speech' on any understanding, and this buffer zone, like that one, "compromises [Plaintiffs'] ability to initiate th[ose] close, personal conversations." *Id.* at 487. If Tennessee were right, an officer could station himself outside any abortion clinic to enforce his own version of the buffer zone this Circuit struck down in *Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400 (6th Cir. 2022), and the First Amendment would be silent. The State offers no response.

Tennessee is wrong, too, to disparage the "First Amendment right to gather information in public settings" that this Court has "recognized," and that the statute's enforcement against Plaintiffs' conduct obviously implicates. *Hils v. Davis*, 52 F.4th 997, 1002 (6th Cir. 2022). Because "[l]aws enacted to control or suppress speech may operate at different points in the speech process," *Citizens United*, 558 U.S. at 336, the First Amendment protects not just the output but the "inputs" of that process—the "conduct that create[s] the speech."

23

*Lichtenstein v. Hargett*, 83 F.4th 575, 585–86 (6th Cir. 2023).  In *Boddie v. ABC, Inc.*, 881 F.2d 267 (6th Cir. 1989), for instance, this Court held that the federal wiretapping law implicates the First Amendment, "even though the statute is not explicitly aimed at speech," because "uncertainty about its scope is likely to inhibit newsgathering and reporting," *id.* at 271. Here, if anything, it should be more obvious that approaching officers in public is "upstream" of being able to see or say anything about their performance of their duties.  *Jordan*, 73 F.4th at 1170 (internal citation omitted).  So when Tennessee gave every officer in the State standardless discretion to criminalize the "conduct that create[s] the speech" Plaintiffs ultimately publish, it should have been ready to face the First Amendment.  *Lichtenstein*, 83 F.4th at 575.

The State's case that it should escape any First Amendment review at all rests on reading *Colten v. Kentucky*, 407 U.S. 104 (1972), to foreclose all First Amendment scrutiny of police orders.  That would be a startling proposition if it were true, but *Colten* does not stand for it. In that case, the Supreme Court addressed a challenge to a disorderly-conduct statute brought by a defendant who "repeatedly interrupted a police officer and refused to leave the area"—a busy highway—"where

24

the officer was issuing a traffic citation." *King v. Ambs*, 519 F.3d 607, 614 (6th Cir. 2008). Kentucky courts had already narrowed the law to ensure it applied "only where there is no bona fide intention to exercise a constitutional right . . . or where the interest so clearly outweighs the collective interest sought to be asserted that the latter must be deemed insubstantial." *Colten*, 407 U.S. at 111. And Colten, the court had found, was not actually trying to exercise any First Amendment rights, so his "refusing to move on after being directed to do so was not, *without more*, protected by the First Amendment." *Id.* at 109 (emphasis added).

In other words, *Colten* was a case where an individual's "act of speaking, by virtue of its time and manner, plainly obstructed ongoing police activity." *King*, 519 F.3d at 614. It does not purport to insulate any and all police commands from First Amendment scrutiny, which would open a staggering gap in the Constitution's protections for free speech. *See Pouillon v. City of Owosso*, 206 F.3d 711, 717–18 (6th Cir. 2000) (reviewing whether a police order "to move to the sidewalk was a reasonable time, place, and manner restriction"). Because no such loophole in fact exists, Tennessee's police buffer-zone statute—just like any other buffer-zone statute—triggers First Amendment scrutiny.

25

### b. The statute cannot survive any degree of First Amendment scrutiny.

As other courts have found, a police buffer-zone statute must confront at least intermediate scrutiny to pass First Amendment muster. *See Nicodemus*, 137 F.4th at 668–70; *Deep S. Today*, 779 F. Supp. 3d at 817–18. Tennessee urges a laxer standard based on *S.H.A.R.K. v. Metro Parks Serving Summit Cnty.*, 499 F.3d 553, 562 (6th Cir. 2007), but that case has little to do with this one. The debate, though, is largely beside the point. Since Tennessee's defense under any standard depends on the atextual claim that an order "cannot lawfully issue without objectively reasonable basis," State Officers' Resp. at 47, its arguments fall away when that dispute is resolved.[6]

For clarity's sake, *S.H.A.R.K.* was a case about "access claims." 499 F.3d at 562. The plaintiffs there did not just want to see what they could see, or photograph what they could photograph, from a vantage point open to the public. Instead, they had set up cameras "installed on trees outside of areas designated for Metro Parks public use" to

---

[6]   Tennessee also has no independent interpretation of what the language "or to retreat" does, if not to create the floating buffer-zone that Plaintiffs' opening brief described. Tenn. Code Ann. § 39-16-612(a).

26

document a deer-culling operation that was set to unfold while the park was closed. *Id.* at 562; *see also Hils*, 52 F.4th at 1002 (describing *S.H.A.R.K.* as "rejecting [a] First Amendment right to hide cameras in a public park after hours"). So *S.H.A.R.K.* sets out the standard for plaintiffs who press an affirmative right of access to information, otherwise *un*available to the public, that the government does not want to make an exception to provide. *See Hils*, 52 F.4th at 1002. It has nothing to say about a statute like this one—analytically identical to any of the abortion-related buffer-zone statutes this Court has reviewed through a common lens—that restricts the exercise of First Amendment rights in traditional public fora. *See Nicodemus*, 137 F.4th at 668–70. In that respect, Tennessee (not Plaintiffs) wants a different constitutional rule for journalists than for anyone else who exercises the right to engage others in conversations. *See McCullen*, 573 U.S. at 487.

Even applying *S.H.A.R.K.*, though, would lead to the same result. As that case recognized, where a rule restricting access to information allows the government to "selectively delimit the audience, a stricter level of scrutiny will apply." *S.H.A.R.K.*, 499 F.3d at 561. Here, because the statute is standardless, officers are free to pick and choose

27

who does and does not get to observe the way they perform their duties in public places. *See Reps. Comm. for Freedom of the Press v. Rokita*, 751 F. Supp. 3d 931, 945 (S.D. Ind. 2024), *aff'd*, 147 F.4th 720 (7th Cir. 2025) ("[A]n officer can order reporters and others to move back simply because the officer does not want to be recorded, an unacceptable curtailment of First Amendment rights."). And even if this Court asked only whether the restriction "is reasonably related to the government's interest," *S.H.A.R.K.*, 499 F.3d at 560, a statute that the State agrees has no enforcement standard at all cannot pass that test, *cf. Minnesota Voters Alliance v. Mansky,* 585 U.S. 1, 21 (2018) (even in nonpublic fora, any restrictions must be "guided by objective, workable standards").

Those shortcomings make clear that the buffer-zone statute cannot survive any degree of First Amendment scrutiny. The State's position, at heart, is that because legitimate interests "can justify *reasonable* police orders," State Officers Resp. at 54 (emphasis added), they also justify this statute—that if any buffer zone has ever been justified, boundless discretion to create a buffer zone is justified. But the fact that a "restricted area" was narrowly tailored at the Kentucky Derby for reasons specific to the Kentucky Derby*, see* State Officers'

28

Resp. at 54–55 (quoting *Blankenship v. Louisville-Jefferson Cnty.*, 162 F.4th 644, 658–59 (6th Cir. 2025)), does not mean that allowing officers to enforce a restricted area everywhere and anywhere, for any reason or no reason, is likewise constitutional.  Ultimately, Tennessee says exactly what Massachusetts said in *McCullen*: "fixed buffer zones would 'make our job so much easier.'"  573 U.S. at 495.  But the right response here is the same one the Supreme Court gave there: "Of course they would.  But that is not enough to satisfy the First Amendment."  *Id.*

## III.    The remaining equitable factors likewise favor Plaintiffs.

Finally, turning to the rest of the preliminary-injunction analysis underlines how starkly the Defendants' briefs diverge from the reasoning of the order under review.  No Defendant says a word to dispute that the District Court "should have assessed [plaintiff's] likelihood of success on the merits before reaching the irreparable injury question."  *Dutton v. Shaffer*, No. 23-5850, 2024 WL 3831884, at *4 (6th Cir. Aug. 15, 2024); *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (same).  On the contrary, the State Officers agree with Plaintiffs that "[l]ikelihood of ultimate success is 'the most important

29

part of the preliminary injunction analysis.'" State Officers' Resp. at 11 (quoting *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020)).

No Defendant argues, either, that irreparable harm would require proof of a past arrest—as the District Court required, *see* Hr'g Tr. at 64:5–6, R.44, PageID#413—if "a constitutional right is being threatened or impaired" by a credible threat of future enforcement, *Bonnell*, 241 F.3d at 809; *see also Hess v. Oakland Cnty.*, 174 F.4th 981, 995–98 (6th Cir. 2026) (same); *Boddy v. Grech*, No. 25-3490, 2026 WL 1678609, at *8 (6th Cir. June 10, 2026) (same). So for all of the unrebutted reasons offered in Plaintiffs' opening brief, the District Court erred by attempting to weigh irreparable harm in a vacuum, without considering the "inseparably linked" question of Plaintiffs' likelihood of success. *Jones v. Caruso*, 569 F.3d 258, 266 (6th Cir. 2009) (citation omitted).

Here as in other constitutional cases, then, the merits are "dispositive because when constitutional rights are threatened or impaired, irreparable injury is presumed, no cognizable harm results from stopping the conduct, and it's always in the public interest to prevent constitutional violations." (citation and internal quotation marks omitted))." *Churchill Downs Tech. Initiatives Co. v. Mich.*

30

*Gaming Control Bd.*, 162 F.4th 631, 642 (6th Cir. 2025).  In the teeth of those settled principles, the District Court allowed Tennessee to continue enforcing a statute that permits each and every officer "to decide arbitrarily which members of the public they will order to disperse"—a law "indistinguishable" in that respect "from the law [the Supreme Court] held invalid in *Shuttlesworth*," *Morales*, 527 U.S. at 58–59 (plurality opinion).  Because there is "no reason to allow this near-certain violation of the plaintiffs' First Amendment rights to continue throughout the pendency of this case," this Court should reverse and "remand for prompt entry of a preliminary injunction." *Cath. Charities v. Whitmer*, 162 F.4th 686, 696 (6th Cir. 2025).

## CONCLUSION

For the reasons given herein and in Plaintiffs' opening brief, Plaintiffs respectfully urge this Court to reverse and remand with instructions to enter an appropriate preliminary injunction.

Dated: June 18, 2026                    Respectfully submitted,

                                        */s/ Grayson Clary*
                                        Grayson Clary
                                          *Counsel of Record*
                                        Paul R. McAdoo
                                        REPORTERS COMMITTEE
                                          FOR FREEDOM OF THE PRESS

31

32

1156 15th Street NW, Suite 1020
Washington, DC 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
gclary@rcfp.org
pmcadoo@rcfp.org

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,496 words, excluding the parts exempted by Fed. R. App. P. 32(f) and Cir. R. 32(b)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and the type-style requirements of Fed. R. App. P. 32(a)(6), because it is set in 14-point Century Schoolbook, a proportionally spaced typeface, and was prepared using Microsoft Word for Mac (version 16.88).

Date: June 18, 2026

/s/ Grayson Clary
Grayson Clary
  Counsel of Record
REPORTERS COMMITTEE
  FOR FREEDOM OF THE PRESS

## CERTIFICATE OF SERVICE

I, Grayson Clary, do hereby certify that I have filed the foregoing Brief for Plaintiffs-Appellants electronically with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the appellate CM/ECF system on June 18, 2026.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Date: June 18, 2026

*/s/ Grayson Clary*
Grayson Clary
  *Counsel of Record*
REPORTERS COMMITTEE
  FOR FREEDOM OF THE PRESS

34